Esther Marion ARMSTRONG, Executrix, Plaintiff,

v.

EMERSON RADIO AND PHONOGRAPH CORPORATION, Defendant.

United States District Court
S. D. New York.

Sept. 14, 1959.

Brumbaugh, Free, Graves & Donohue, New York City, for plaintiff. Dana M. Raymond, Ruloff F. Kip, Jr., Richard G. Fuller, and Edward Carr, New York City, of counsel.

Darby & Darby, New York City, for defendant Floyd H. Crews, Morris Relson and Robert A. Maikis, New York City, of counsel.

PALMIERI, District Judge.

### INTRODUCTORY STATEMENT

This suit concerns important discoveries in the radio art. The contribution of the inventor, Major Edwin Howard Armstrong, with respect to all three of the inventions in suit, was a new technique for suppressing noise in radio signalling known as wide band frequency modulation (FM). This has made possible a substantial improvement in the faithfulness of reproduction of sound transmitted by radio and a marked reduction in noise and interference. Distinguished witnesses with outstanding backgrounds in the radio field have supported plaintiff's contention that Major Armstrong's system of wide band frequency modulation was contrary to the then accepted practice and theory in radio. No radio apparatus was known to be in existence prior to the Armstrong disclosures which could produce the results Armstrong achieved. Indeed, the evidence is clear and persuasive that Armstrong's wide band FM system was considered, in the middle 1930's, by persons well informed in the radio art, to operate on principles which were contrary to the then known practice and theory. This view was made manifest by a period of recantation among leading theoreticians; and by the recognition accorded Armstrong by learned societies and by persons distinguished in the radio and communications fields.

Noise and static constituted a longstanding and vexatious problem in radio. The theory generally entertained, prior to the disclosures of Armstrong here in suit, was that noise or static produced a radio response in a receiver which had

the same physical characteristics as the radio signal; and that anything done at the receiver to strengthen the radio signal would also strengthen the noise and static in the receiver. It was generally assumed by those well informed in radio that there was nothing fundamental that could be done about the ever-present problem of noise and static in radio. Various schemes and devices for the elimination of static were tried and tested and found to be unsatisfactory. One eminent authority, John R. Carson, summed up the situation in 1928 as follows: "In fact as more and more schemes are analyzed and tested, and as the essential nature of the problem is more clearly perceived, we are unavoidably forced to the conclusion that static, like the poor, will always be with us."

The history of the many fruitless attempts to deal with this problem is a very interesting phase of Armstrong's labors. Armstrong's pioneering work was based on the assumption that there was a workable signal in a radio receiver; and he sought to ascertain how the noise and static that comes into the receiver or happens to be there at the same time, could be suppressed. His accomplishment was to produce a system which, within practical limits of signal strength at the receiver, suppressed noise and static to an extent which before him was believed to be impossible as a matter of basic theory. This result was obtained by building particular kinds of selective circuits and employing them in a particular system of frequency modulation. What Armstrong achieved was the result of great sacrifice, energy and perseverance, including the expenditure of substantial amounts of his own funds. The result of his accomplishment was to extend the practical range of radio communication in many fields. It further made possible, in broadcasting, a fidelity of reproduction far beyond anything considered feasible theretofore, and characterized by an unusual clarity and purity of tone, even in cases of musical instruments having wide range and subtle tonalities. The inventions here in suit are to be found in every FM broadcast receiver, in every television receiver, and they have wide application to military, police, and other mobile services.

It is notable that during the time of Major Armstrong's research and experimentation, a number of important business corporations maintained laboratories well equipped for the investigation of noise in radio signalling and for the uses and applications of frequency modulation. Yet, none of them achieved his results. Their failure to do so stands as an indication that prior references were of no help. Indeed, they gave persuasive evidence of Major Armstrong's accomplishment by paying him substantial sums of money for the right to use his new radio system.

Moreover, the lengthy record in this case fails to disclose the existence of any apparatus which embodied the circuits and which was capable of producing the results which Armstrong disclosed. Major Armstrong was truly a pioneer in the field in theory and in fact.

Furthermore, the record is clear that Emerson imitated and used the three inventions of Major Armstrong here in suit, in the manufacture and sale of its television receivers and FM broadcast receivers. The structural and operating characteristics of the infringing receivers of Emerson, and the comparison of the Emerson circuits with the disclosures in the Armstrong patents, have presented substantially no dispute in this case. The conclusion is inescapable that the inventive features of the three patents in suit are found in the accused receivers. Moreover, Emerson's extensive arguments based upon prior art have been speculative, inconclusive, and unconvincing. In no instance have they been based upon the actual performance of existing frequency modulation apparatus antedating the Armstrong disclosures here involved.

The three related inventions which are the subject of this suit constituted an outstanding contribution to the radio art. They resulted in a practical solution of what had been regarded as an

insuperable problem in radio communication, namely, the suppression of static and other noise and interference from other stations. In sum, I hold that plaintiff's patents are valid, that they were not anticipated by prior art, and that they were infringed by defendant.

A further comment may be useful with respect to Emerson's defense of license. This defense is based upon Emerson's license under patent No. 1,941,447. This patent is not here in suit, and it did not disclose or remotely suggest the inventions which are here in suit.

The Findings of Fact have been so arranged as to deal with each patent separately and in accordance with a systematic plan of treatment set forth in the index attached hereto as an appendix.

At the outset of the trial, and by agreement of the parties, I was furnished with a handbook of basic information and definitions, prepared expressly as an aid to the Court, entitled "Memorandum Concerning Some of the Fundamentals of Radio Communication." (Plaintiff's Exhibit 105.) This is incorporated by reference and what follows is based upon a general familiarity therewith.

### FINDINGS OF FACT

*The Nature Of The Action And The Pleadings*

1. This is an infringement action under the patent laws of the United States for infringement of the following three patents:

   a. Patent No. 1,941,066 (066), issued December 26, 1933 to Edwin H. Armstrong on an application filed July 30, 1930. Plaintiff relies on claims 8, 9 and 10.

   b. Patent No. 1,941,069 (069), issued December 26, 1933 to Edwin H. Armstrong on an application filed January 24, 1933. Plaintiff relies on claims 1 and 2.

   c. Reissue Patent No. 21,660 (Reissue), issued December 17, 1940 to Edwin H. Armstrong on a reissue application filed October 21, 1940. This is a reissue of original Patent No. 2,215,284 issued September 17, 1940 on an application filed February 19, 1940. Plaintiff relies on claims 1, 2, 4, and 6.

2. The complaint was filed on December 21, 1953. The answer was filed on January 7, 1954, and a stipulation and order amending the answer were filed on October 4, 1957.

3. The complaint charges Emerson Radio and Phonograph Corporation (Emerson) with infringing, during the six years next preceding the date of filing of the complaint, and until their expiration, the 066, 069, and Reissue patents, by making, using, and selling apparatus embodying the inventions claimed in the patents. The 066 and 069 patents expired on December 26, 1950. The Reissue patent expired on September 17, 1957.

4. The answer, as amended, asserts the defenses of non-infringement; license; misuse; and invalidity because of

   a. prior disclosure,

   b. abandonment,

   c. prior patenting by the inventor in a foreign country,

   d. obviousness of the invention, and

   e. failure of the specification and claims to comply with the requirements of the patent laws.

Abandonment is not now urged by defendant.

The Reissue patent is attacked on the grounds that there was no error in the original application, that there was unreasonable delay in applying for the Reissue patent, that the Reissue oath is inadequate, and that the Reissue patent is not for the same invention as the original patent.

*The Parties*

5. Plaintiff is Esther Marion Armstrong (Armstrong), the widow and executrix of the last will and testament of Edwin Howard Armstrong (Major Armstrong), the original plaintiff in this action. Major Armstrong died on February 1, 1954, less than two months after

the complaint was filed. He was the sole owner of the three patents in suit. After a contested motion, Esther Marion Armstrong was substituted as plaintiff by order of this Court (Dawson, J.) dated June 17, 1955. Judge Dawson's opinion on the motion was filed June 7, 1955 and is reported at 132 F.Supp. 176.

6. At the trial, Emerson moved to dismiss the complaint for lack of jurisdiction on the ground that the cause of action did not survive the death of the original plaintiff. This motion was denied on the ground that the same question had been decided, adversely to defendant, by Judge Dawson in connection with plaintiff's earlier motion for substitution, referred to in Finding 5.

7. Defendant Emerson is a New York corporation. It is a manufacturer of television and radio broadcast receivers.

### Notice Of Infringement

8. Major Armstrong gave notice to the public of the patents in suit by causing to be placed the required statutory notice on apparatus embodying the inventions of the patents in suit manufactured and sold under license from him.

9. On or about December 20, 1948, Major Armstrong gave written notice to Emerson of its infringement of each of the patents in suit.

### The Accused Sets (Identification)

10. The accused radio and television receivers made by Emerson are:

(a) A table model of a television receiver which is designated by Emerson as Model No. 614, and which contains radio circuits for television sound, designated by Emerson as Chassis No. 120110B;

(b) A table model of a television receiver which is designated by Emerson as Model No. 571, and which contains radio circuits for television sound designated by Emerson as Chassis No. 120066;

(c) A table model of an FM broadcast receiver which is desig-

nated by Emerson as Model No. 557, and which contains circuits and electrical equipment designated by Emerson as Chassis No. 120048B;

(d) A console model of an FM broadcast receiver which is designated by Emerson as Model 586, and which contains circuits designated by Emerson as Chassis No. 120023B; and

(e) All other FM broadcast receivers and television sound receivers which are materially similar to the foregoing in structural and operating characteristics and which were manufactured and sold by Emerson within six years of the filing of the complaint herein and before the expiration of the patents in suit.

11. The video (picture) portion of a TV program is broadcast on amplitude modulation. This portion of the above Emerson TV receivers is not accused of infringement. The sound portion of a TV program is broadcast on frequency modulation. Only those portions of the Emerson TV receivers having to do with reproduction of the broadcast sound are charged with infringement.

### PART I

### The 069 Patent

### The Discovery

12. Major Armstrong informed the radio engineering profession how the audible effects of noise in radio telephony could be reduced by employing a particular kind of frequency modulation.

13. The basic characteristics of the particular system of frequency modulation disclosed by Major Armstrong are as follows:

(a) That the swing of the carrier at the transmitter in accordance with the intelligence to be transmitted shall be substantially greater than the range of audible frequencies for the system;

(b) That the receiver in all its radio and intermediate frequency stages shall have a pass band suffi-

ciently wide to receive and amplify the wide swinging carrier throughout the full extent of its excursions;

(c) That the receiver shall have means for suppressing amplitude variations in the carrier caused by the disturbances; and

(d) That the receiver shall have a selective system (discriminator) which provides for full audible response to the wide swings of the carrier and provides for substantially lesser audible response to the narrow swings of the carrier at audible rates which are caused by the disturbances.

14. Major Armstrong's teaching was based in part on his observation that in a frequency modulation receiver, tube noise and other spectrum-like disturbances may manifest themselves as frequency variations in the received signaling wave and that such frequency variations will, in the presence of a strong carrier, be limited in extent insofar as they are capable of producing an audible response from the receiver.

15. The Court heard recordings of Armstrong's 1935 Haddonfield and Columbia University tests. In each case, AM was compared with FM. In the Haddonfield tests, standard broadcast AM (at 550 to 1600 kc) was compared with FM (at 41 Mc), while in the Columbia tests, AM and FM were compared at 110 Mc. In the Haddonfield tests, natural static was evident on AM and not on FM. In the Columbia tests, man-made static (i. e. truck ignition noise) was evident on AM and not FM.

16. Freedom from natural static is a characteristic of the very high frequency ranges, and is available equally for AM or FM.

17. Major Armstrong taught that tube noise and spectrum-like disturbances would also manifest themselves as amplitude variations on the carrier, and that the effect of such amplitude variations could be suppressed by effective limiting in the receiver.

18. In radio communication by amplitude modulation the bandwidth for the transmitter and the receiver depends upon the range of audible frequencies to be reproduced in the receiver.

19. In the practice with amplitude modulation in broadcasting, the bandwidth is substantially equal to twice the range of audible frequencies to be reproduced.

20. In the frequency modulation system referred to in Finding 13 herein, the bandwidth for the transmitter and the receiver is not twice the range of audible frequencies to be reproduced. The bandwidth depends on the range of excursion of the wide swinging carrier and is several times the bandwidth required for amplitude modulation.

21. The limiter in the receiver of the frequency modulation system referred to in Finding 13 herein performs the function of suppressing amplitude variations on the carrier caused by tube noise and other spectrum-like disturbances when such noise and disturbances occur in the receiver at levels of strength which are lower than the carrier.

22. Armstrong published a formula for the improvement with respect to the suppression of noise which could be obtained with the wide band frequency modulation in accordance with his teaching as compared with amplitude modulation when operating at the same carrier frequency and power and transmitting and receiving the same signal. His formula is that the improvement in terms of voltage ratio for noise in the two systems is equal to 1.7 times the deviation of the wide band carrier (½ peak-to-peak swing) divided by the audible frequency range for the two systems.

23. The formula provides a correct measure of the improvement in suppression of noise that may be obtained in the frequency modulation system referred to in Finding 13 herein as compared with amplitude modulation.

24. The suppression of noise in the system of frequency modulation referred to in Finding 13 herein results from

a combination of two actions at the receiver. One action is that the wide band receiver discriminates between the wide variations in frequency due to the signal and the lesser variations in frequency caused by the disturbances. The other action is that the receiver eliminates amplitude variations in the received wave caused by the noise. Neither one of these actions without the other would result in suppression of noise.

## The Disclosure

25. The 069 patent stated that tube noise sets the ultimate limit for radio communication at frequencies of about 30 megacycles and greater.

26. The 069 patent disclosed that tube noise is a spectrum-like disturbance.

27. In the early '30's, tube noise was recognized as setting the ultimate limit to radio communication on the very high frequencies.

28. The disclosure of the 069 patent with respect to variations in amplitude and variations in frequency caused by tube disturbances was intended, and would have been understood in 1933 by persons skilled in the art, to apply to all spectrum-like disturbances in a radio receiver.

29. The opening paragraph of the 069 patent states that the invention relates to a method of increasing the distance of transmission which may be covered in radio signaling with very short waves.

30. The second paragraph of the 069 patent says that it is well known that waves of the order of 10 meters or lower are limited in the distance of transmission by tube noise alone as the amount of static in that part of the spectrum is negligible.

31. The third paragraph of the 069 patent states that the tube noise referred to is the electrical disturbances which are created in the first tube in a chain of vacuum tube amplifiers and that when these disturbances are amplified by the chain and supplied to the detector they are great enough to mask the effect of the signal when the signal falls below a certain level.

32. The fourth paragraph of the 069 patent states that the patent discloses a method of overcoming this type of disturbance by the use of frequency modulation in a particular way with a consequent increase in the distance over which communication may be maintained.

33. The 069 patent states at page 3, col. 2, lines 128–132, that by using FM in this particular way it becomes possible to operate over distances which were quite impossible with the methods previously known.

34. The 069 patent described in qualitative terms the art of suppressing noise by a particular system of frequency modulation as follows:

"I have discovered that by imparting a greater swing to the frequency of the transmitted wave than can exist in the disturbances due to tube irregularities and providing means for selecting these large swings of frequency which are at the same time substantially not responsive to the lesser swings due to the tube disturbances or to the variations in amplitude due to these disturbances, that a very great improvement in transmission can be produced."

35. The 069 patent disclosed that the frequency variations caused by noise and spectrum-like disturbances in the presence of a strong carrier and which are capable of creating an audible response from the receiver will not be greater than the audible frequency range of the receiver.

36. The 069 patent disclosed that the swing of the carrier was to be many times greater than the audible frequency range.

37. In the particular embodiment described in the 069 patent, the swing was equal to ten times the audible frequency range for that embodiment. The swing was 100,000 cycles and the audible frequency range was 10,000 cycles.

38. The 069 patent disclosed that the bandwidth of the receiver and the bandwidth for the transmitter in all of their stages were to be several times the bandwidth required for amplitude modulation.

39. At page 2, col. 1 in the paragraph beginning at line 66, it is stated that the swing should be many times greater than the audible frequency range.

40. Armstrong also suggested in the 069 patent that for larger swings, the improvement in signal-to-noise would be increased.

41. At page 3, col. 1, beginning at line 15, it is stated, in effect, that as a practical matter the audible frequency range can be taken to be 10,000 cycles.

42. The patent at page 2, col. 1 beginning at line 46 and again at page 3, col. 2 beginning at line 133, gives an example of a swing of 100,000 cycles, or 100 kc.

43. The 069 patent disclosed that the transmitter described in Armstrong Patent No. 1,941,068 might with modification be employed in the system disclosed in the 069 patent.

44. At page 1, col. 2, line 89, the 069 patent refers to an Armstrong application "filed of even date herewith." That is a reference to Patent No. 1,941,068, issued December 26, 1933 on an application filed January 24, 1933.

45. The 069 patent disclosed that for use in the system described therein, the transmitter described in the 068 patent is to be modified by adding multipliers and increasing the bandwidth so as to provide for a swing many times greater than the audible frequency range.

46. The 068 patent discloses a transmitter having a circuit shown in Fig. 1 and the 069 patent discloses a transmitter having a circuit shown in its Fig. 1.

47. The embodiment of a frequency modulation transmitter particularly described in the 068 patent had a swing of about 7,860 cycles.

48. The 068 patent disclosed a standard for full modulation of the frequency modulation transmitter. The standard was that for 100% modulation there should be about a 45-degree phase shift for the highest modulation frequency to be transmitted.

49. In accordance with such standard, there would be one set of side bands for the highest modulation frequency and in that respect the side bands would be analogous to the side bands present in amplitude modulation.

50. The embodiment of a transmitter particularly described in the 068 patent would produce a frequency modulated wave which could be received by a frequency modulation receiver having the same bandwidth as an amplitude modulation receiver designed to receive a comparable range of audible frequencies.

51. The 069 patent disclosed that a receiver for use in the system of that patent might employ the same general method for translating variations in frequency of radio frequency currents into currents of audible frequency that was disclosed in the 447 patent. That general method comprises (a) the use of series reactance networks for converting variations in frequency into variations in amplitude of the radio frequency currents illustrated in the 447 patent (Fig. 2) by the networks 40, 41 and 39, 40, 41 and in the 069 patent (Fig. 2) by the networks 52, 54 and 53, 55 and (b) the method of balancing the currents of audible frequency from each of the detectors illustrated in Fig. 2 of the 447 patent and Fig. 2 of the 069 patent (069 patent, p. 2. col. 1, lines 31–45; p. 2 col. 1, line 73 to col. 2, line 84; 447 patent, p. 2, col. 1 to col. 2, line 79).

52. The 069 patent disclosed that the receiver for use in the system of the 069 patent was to be constructed so that all of its circuits, including the radio frequency stages, the intermediate stages, the limiter and the discriminator would have a bandwidth several times greater than the bandwidth required in an amplitude modulation receiver (069 patent, p. 2, col. 1, line 73 to p. 3, col. 2, line 90).

53. The 069 patent disclosed that the receiver described therein would have

limiter circuits which would be effective to wipe out amplitude variations caused by tube disturbances (069 patent, p. 2, line 133 to p. 3, line 68 and p. 4, lines 19 to 46; contrast 447 patent, p. 1, lines 63–67).

54. The 069 patent disclosed that limiting in the receiver was to be effective to wipe out amplitude variations caused by tube disturbances (p. 3, col. 1, lines 38–46, p. 4, col. 1, lines 24–46).

### The Impact—Prior Art Practice and Theory

55. In the 1920's, the principal disturbances in radio were static due to natural disturbances and interference from other radio transmissions.

56. Transmission of radio signals is utilized for a wide variety of purposes, including airdrome control; fixed point and mobile communication; radio navigation; broadcasting; citizens' radio communication; radio relay; governmental, amateur, and industrial.

57. For radio broadcasting, the carrier wave is caused to be varied (modulated) at the transmitter by the audio modulating signal. After the modulated carrier wave is received at the receiver, it is demodulated (detected) to recover a replica of the original modulating signal, in the course of which the carrier is discarded. The recovered modulating signal, which is again an audio frequency signal, is then passed to a loudspeaker in which it is converted back to audible sound waves to be listened to.

58. In receivers of the superheterodyne type, the received modulated carrier is first converted to a new (generally lower frequency) carrier wave, called an intermediate frequency signal or wave, before being demodulated.

59. There are two types of transmission of radio signals (programs) in use in the commercial broadcast bands today. These are amplitude modulation (AM) and frequency modulation (FM).

60. In both types of radio transmission a carrier wave is used. In both cases, the carrier wave is characterized by a frequency (i. e., number of alternations of polarity per second) indicative of its channel or tuning position, and by an amplitude (i. e., magnitude or strength), indicative of its power or strength. In amplitude modulation the *amplitude* of the carrier wave is modulated in accordance with desired signals representing the program, to produce the signal which is transmitted over the air to the home receiver. In frequency modulation, the *frequency* of the carrier wave is modulated in accordance with the program to produce the signal which is transmitted over the air to the receiver. In each case, at the receiver the received carrier wave is amplified and ultimately detected to abstract the electrical program signals for reproduction as sound in a loudspeaker.

61. In the history of broadcasting and radio communication, the first work was done on relatively low and medium frequencies from 30 kilocycles to 2 or 3 megacycles (millions of cycles per second). As more and more channels were taken up and used, and as technology advanced, higher and higher frequencies became gradually practical.

62. For frequencies used for trans-oceanic and long distance communications, up to about 20 megacycles, another form of atmospheric disturbance known as fading was troublesome. It caused both slow and fast fluctuations in the signal strength, and with AM transmission could create disturbing audible interference in the receiver. Fading could be so severe as to blank out the entire received signal at times.

63. In the late 1920's and early 1930's disturbances caused by thermal noise and tube noise generated in the radio receiver itself became an important problem with the development of radio apparatus to operate at frequencies of 20 megacycles and above.

64. It was accepted theory that thermal noise and tube noise in the receiver fixed a limit to the signal-to-noise ratio which could be secured at the output of a radio receiver.

65. The practice in keeping natural static, manmade static, interference from

other stations, tube noise and thermal noise to a minimum was to reduce and maintain the bandwidth for radio transmission and reception to the minimum required for transmission and reception of the audible frequencies.

66. John R. Carson, an authority on the theory of radio communication, likened the attempt to reduce the effect of such disturbances to the attempt to build a perpetual motion machine.

67. It was accepted theory that any scheme for reducing the effect of such disturbances beyond what could be accomplished by operating with as narrow a bandwidth as possible and as great effective signal strength at the receiver as was available would be impossible of achievement.

68. Frequency modulation has been known as a matter of theory since as early as 1910.

69. During the 1920's, frequency modulation was proposed as a method for narrowing the bandwidth for radio communication as compared with the bandwidth requirements for amplitude modulation. The scheme was wrong as a matter of theory and unsuccessful in practice.

70. During the late 1920's and early 1930's, it was widely accepted in the radio engineering profession that frequency modulation would inherently distort the signal and that there were not any compensating advantages as compared with amplitude modulation.

71. In the experimental practice with frequency modulation before 1933, the bandwidth for the receiver was the same or less than the bandwidth for an amplitude modulation receiver designed to reproduce the same audible frequencies.

72. In the period from 1926 to 1932, frequency modulation that would operate within the same bandwidth or a lesser bandwidth than the bandwidth required for amplitude modulation was proposed or suggested as a means for dealing with fading (Demarest Patent No. 2,047,312; Armstrong Patent No. 1,941,447; Wright & Smith Patent No. 1,964,375). The only work in frequency modulation in the 1920's and early 1930's was experimental.

73. In 1931 the RCA conducted transcontinental tests using FM, the transmitter being located at Bolinas, Calif., and the receiver at Riverhead, Long Island. These tests were on carrier frequencies of around 13 mc and used a bandwidth of 10 kilocycles with an audio of 5,000 cycles and 3,000 cycles deviation. At its receiver at Riverhead, RCA used a limiter and a balanced detector.

74. In the tests carried out by RCA in 1931, it was found that amplitude modulation was superior to such frequency modulation in dealing with fading.

75. Armstrong first worked out his discovery in his laboratory at Columbia University.

76. In 1934 RCA made available to Armstrong a short wave transmitter located on the Empire State Building. In 1934 and 1935 Armstrong conducted a series of tests from this transmitter to a receiver located first at Westhampton, L. I. and later at Haddonfield, N. J.

77. At Armstrong's invitation, some fifty or more RCA executives and engineers, including the President, Mr. Sarnoff, the Vice President for Research, Dr. Jolliffe, and the Director of Research, Dr. Beverage, visited the demonstrations at Haddonfield, New Jersey.

78. Armstrong gave talks on and demonstrations of his discovery to many engineering groups around the country beginning in 1935.

79. In 1935 Armstrong presented a paper (Plaintiff's Exhibit 33) to the Institute of Radio Engineers (IRE), and he gave a demonstration at that meeting.

80. The publication of Major Armstrong's IRE paper (Plaintiff's Exhibit 33) had a great influence upon the art.

81. A highlight of Major Armstrong's IRE paper (Plaintiff's Exhibit 33), which was of great interest in the radio art, was his announcement of the engineering principle that an improvement over amplitude modulation with re-

spect to signal-to-noise ratio and interference from other stations could be obtained by employing frequency modulation with much greater bandwidth and that the amount of that improvement would increase with the square of the bandwidth that was employed.

82. Another highlight of Major Armstrong's IRE paper was that he reported on field tests of wide band frequency modulation and thereby demonstrated that the results which he claimed for wide band frequency modulation were not simply a matter of theory and laboratory experiment which, as in the case of many other so-called static eliminators, would not materialize when subjected to actual operating conditions.

83. In the IRE paper, supra, Major Armstrong pointed out and explained the striking phenomenon that in the wide band frequency modulation system which he had built and tested there was an immunity from interference created by other stations that was of the same order of magnitude as the immunity of the system to tube noise.

84. In July 1937, John A. Carson and Thornton Fry published an article in which they confirmed as a matter of theory that wide band frequency modulation would provide the suppression of noise which Armstrong had demonstrated and reported on in practice in his IRE paper.

85. The conclusions of the Carson and Fry article are now generally accepted.

86. Hans Roder published an article in January 1937 in which he revised his theory of frequency modulation and confirmed as a matter of theory that noise could be suppressed in radio communication by using wide band frequency modulation as described by Major Armstrong in his IRE paper.

87. Prior to the issuance of the 069 patent and the publication of the IRE paper by Major Armstrong, there was no conception in the engineering profession that widening the band would be useful in reducing noise.

88. The teaching of Major Armstrong concerning how noise might be suppressed by widening the band was contrary to prior practice and theory in the radio art.

89. The art of suppressing noise by the particular system of frequency modulation heretofore described in Findings 12, 13, 20 and 21 herein was a discovery which profoundly influenced the radio art.

### Adoption and Use of Wide Band FM in this Country and Use Abroad

90. In June 1936 Major Armstrong informed the Federal Communications Commission concerning the FM system which has been described in Findings 13, 20 and 21 herein and recommended that the Commission provide for its use for a new broadcasting service on the very high frequencies.

91. At the hearing before the Federal Communications Commission, Major Armstrong played recordings to demonstrate the performance of the FM system described in Findings 13, 20 and 21 herein as compared with the performance of amplitude modulation at the same frequency and power.

92. At the hearing Major Armstrong played a recording to demonstrate the performance of the FM system described in Findings 13, 20 and 21 herein at a distance of about 85 miles between the receiver and the transmitter (2 kilowatts) as compared with reception on the standard broadcast band over substantially the same distance from the 50 kilowatt Station WEAF in New York.

93. In August 1936, the Federal Communications Commission authorized experimental broadcasting with FM on a channel of 200 kilocycles and at the same time authorized experimental short wave broadcasting by amplitude modulation on a channel of 30 kilocycles.

94. At that time, there were no frequency modulation receivers on the market.

95. In 1935 Major Armstrong and C. R. Runyon, Jr. set up and operated an FM transmitter at Yonkers, New York,

operating in a channel of 200 kilocycles. The call letters were W2AG and the transmitter operated at a frequency of 110 megacycles. The recordings played by Major Armstrong to the Federal Communications Commission to compare the FM system with amplitude modulation operating on the same frequency and at the same power were recordings of transmissions from the Station W2AG.

96. In 1936, Major Armstrong began the construction of a high power FM station at Alpine, New Jersey. The station with call letters W2XMN went on the air in 1938 and was the first high power FM station in operation in this country and in the world.

97. In the period from 1937 to 1940, the Yankee Network built and installed FM stations operating in a channel of 200 kilocycles on the top of Mt. Washington and Mt. Asnebumskit.

98. In 1939 the General Electric Company offered for sale the first commercial FM receiver capable of receiving FM transmissions from the Alpine Station of Major Armstrong and the FM stations of the Yankee Network.

99. In March 1940, the Federal Communications Commission held a public hearing to determine whether FM broadcasting should be authorized as a public service and to fix the standards for such a service. In May 1940, the Federal Communications Commission authorized FM broadcasting as a public service and fixed the standards therefor, including a channel width of 200 kilocycles, a peak-to-peak swing of 150 kilocycles for full modulation on peaks of frequent recurrence and pre-emphasis of the audio signal at the transmitter. Such standards were in accordance with the practice of Major Armstrong at the Alpine Station and of the Yankee Network at the stations on Mt. Washington and Mt. Asnebumskit.

100. In March 1941, the Federal Communications Commission authorized television as a public service and provided that the sound transmission in television broadcasting would be in accordance with the FM system which had been previously authorized for FM broadcasting.

101. In November 1945, the Federal Communications Commission changed the standards for television broadcasting and provided that the sound transmission would be by frequency modulation with a peak-to-peak swing of 50 kilocycles instead of the peak-to-peak swing of 150 kilocycles which had been previously authorized. The Commission recommended in its Standards that television sound transmitters should be capable of a peak-to-peak swing of 80 kilocycles.

102. Some FM broadcast stations went on the air, and some 395,000 FM receivers were built before the war. All activities were suspended during the war. After the war the Federal Communications Commission again held hearings in 1945 to decide what frequencies should be allocated to FM and what to television, and what system of modulation should be used for television.

103. In 1945 the television broadcasting industry had had experience with the TV sound on AM from 1938 to 1941 and on FM with 150 Kc swing from 1941 to 1945.

104. In May 1945, the Federal Communications Commission decided that the FM broadcast service should be moved from the frequencies previously allocated to it (42 to 50 megacycles) to the frequencies from 88 to 108 megacycles. That change in frequencies made obsolete all frequency modulation receivers constructed before the War.

105. The Federal Communications Commission issued revised Rules and Standards for FM broadcasting and television sound broadcasting which Rules are still in effect insofar as they provide for channel spacing, peak-to-peak swing for 100% modulation on peaks of frequent recurrence and the use of pre-emphasis in those services.

106. In the FM broadcast service, the reduction in noise at the output of a properly designed receiver as compared with the noise from a comparable amplitude modulation system operating at the same

power and at the same frequencies is readily apparent to the listener.

107. In the television sound service, the reduction in noise at the output of a properly designed receiver as compared with the noise from an amplitude modulation receiver at the same frequency and same power is readily apparent to the listener at many locations and under many conditions in which the service is provided.

108. Frequency modulation broadcasting with a peak-to-peak swing of 150 kilocycles is now in wide use in the United States and abroad. In the United States there are about 540 FM broadcast stations on the air and there are approximately 12,000,000 FM broadcast receivers in use in this country.

109. FM sound signals with a peak-to-peak swing of 50 kilocycles are broadcast by approximately 500 television stations in the United States and received by about 46,000,000 television receivers throughout the country.

110. In Western Europe, including England and France, there are now about 500 FM broadcast stations on the air, operating with a peak-to-peak swing of 150 kilocycles for full modulation.

111. In about 50 foreign countries FM signals with a peak-to-peak swing of 100 kilocycles are employed for the sound transmission in television broadcasts and there are about 10,000,000 television broadcast receivers in those countries.

112. Short wave broadcasting by amplitude modulation was in operation in the United States before World War II and by Sarkes Tarzian for a short period after World War II. Such broadcasting has been abandoned.

113. In the police services, frequency modulation with a peak-to-peak swing of 30 kilocycles to transmit an audible frequency range up to and not greater than 3,000 cycles is in wide use in the United States. Such apparatus is an application of the system of frequency modulation described in Findings 13, 20 and 21 herein.

114. During World War II the United States Signal Corps and the Armoured Forces adopted and made use of frequency modulation with peak-to-peak swings from 40 to 100 kilocycles for the transmission of voice frequencies up to about 3,000 cycles.

115. For purposes of tactical communication services, the apparatus was found by the Armoured Forces and the Signal Corps to provide a substantial reduction in noise and interference as compared with other apparatus operating with amplitude modulation that had been employed in those services.

116. Since 1956, there has been a marked increase in the number of new applications for FM broadcast stations in the United States and in the manufacture of FM broadcast receivers.

### Recognition of Wide Band FM as Outstanding Contribution to the Art

117. In 1941, The Franklin Institute of Pennsylvania awarded The Franklin Medal to Major Armstrong and stated that the award was in recognition of his pioneer work in a system of wide swing frequency modulation as well as in recognition of earlier pioneer work done by him in the period from about 1913 to 1922. In making the award, The Franklin Institute concluded that the work of Major Armstrong in connection with a system of wide swing frequency modulation was in itself an outstanding contribution to the art.

118. The Franklin Medal is the highest award of The Franklin Institute. The Franklin Institute is the most prominent organization in the United States which is concerned with the continuous evaluation of contributions in all phases of science and technology. As an honor to a scientific man, The Franklin Medal compares on a world basis with the Nobel Prize.

119. In 1942, The American Institute of Electrical Engineers awarded The Edison Medal to Major Armstrong and referred specifically to his contributions in connection with the regenerative cir-

cuit, the superheterodyne circuit and wide range frequency modulation.

120. The Edison Medal is generally regarded in the electrical engineering profession as being the highest honor in this country which may be received by an electrical engineer.

121. In May 1940, the Federal Communications Commission in referring to the frequency modulation system which had been disclosed to it by Major Armstrong and in deciding that such frequency modulation would be employed in a broadcasting service for the public, stated: "The Commission believes that this is one of the most significant advances that has been made in aural broadcasting in recent years."

122. In November 1954, the Board of Appeals of the German Patent Office granted to the executrix of Major Armstrong, over the opposition of ten principal German radio manufacturers, a German patent corresponding to the 069 patent. The Board of Appeals of the German Patent Office analyzed the prior art which had been cited by the opposers and in its decision expressly referred to the Dome patent, the Purington patent, the Van der Pol article and British Patent 290,642 corresponding to the Armstrong 447 patent (hereinafter referred to in Findings 132 to 156 and 184 to 192 herein) and found that none of the prior art references disclosed or anticipated German Patent 924,809 corresponding to the 069 patent.

### The Claims and their History

123. The term "variation in frequency" appearing in the claims of the 069 patent means, in the light of the specification, the peak-to-peak swing of the carrier for full modulation. Such swing is fully responsive to and dependent only on the modulating signal.

124. The requirement in the claims of the 069 patent (sometimes referred to as the Wide Band patent) that such variation in frequency shall be substantially greater in extent than the range of good audibility means that such variation in frequency shall be many times greater than the audible frequency range to be reproduced.

125. In the particular embodiment described in the Wide Band patent the "variation in frequency" was 100,000 cycles and was ten times the audible frequency range which the patent specified for that particular embodiment.

126. The term "range of good audibility" appearing in the claims of the Wide Band patent means the range of frequencies from the output of the receiver which are of a "really audible character."

127. For the embodiment which the Wide Band patent particularly described, the "range of good audibility" comprised audible frequencies up to about 10,000 cycles.

128. In the middle 1930's, the range of audible frequencies up to about 10,000 cycles was generally accepted as being the maximum range of audible frequencies which could as a practical matter be transmitted and received in an aural broadcast service.

129. The requirement in the claims of the Wide Band patent that amplitude variations shall be substantially eliminated or limited means that amplitude variations in the received modulated wave caused by noise and spectrum-like disturbances shall be substantially eliminated.

130. Claim 1 of the 069 patent claims a "selective system" and claim 2 a "detector system," for translating frequency variations into amplitude variations, both systems being "substantially not responsive to the lesser variations in frequency of the spectrum of the disturbances to be eliminated" and claim 2 adding "nor to variations in amplitude of said disturbances." (069 patent, page 4, column 2, lines 103, 119.) The requirement in the claims of the 069 patent that the "selective system" (Claim 1) or "detector system" (claim 2) shall be fully responsive to the wide variations in frequency of the signal but substantially not responsive to the lesser variations in frequency of the spectrum-

like disturbances means that the bandwidth of all circuits in the receiver up to the audio detectors shall be sufficiently wide to pass all frequencies within the range of the peak-to-peak swing of the carrier.

131. Each of the claims of the 069 patent particularly points out and distinctly claims the system or art of suppressing noise in radio by the system of frequency modulation described in Findings 13, 20 and 21.

### The Prior Art

PURINGTON PATENT 1,599,586

Applied for April 27, 1922
Issued Sept. 14, 1926

132. The Purington patent related to a system for use in telegraphy or telephony in which a wobble in frequency was produced at the transmitter and the input circuit of the receiver was tuned on one portion of the wobble to provide a response to the wobble in frequency.

133. The apparatus specifically referred to in the Purington patent was intended for operation on the standard broadcast band.

134. The Purington patent did not state or suggest anything concerning noise in radio signaling or concerning the reduction of noise in radio signaling.

135. The Purington patent expressly stated that the receiver was to be adjusted for sharp resonance. It expressly stated that the bandwidth of the receiver was to be less wide than the bandwidth to be provided for the transmitter circuits.

136. The Purington patent did not disclose any advantage or utility for the particular range of wobble in frequency, viz. 24 kilocycles, which the patent stated could be obtained at the transmitter which was particularly described.

137. The Purington patent proposed the transmission of supersonic frequencies but made no disclosure concerning the bandwidth at the transmitter or the receiver which would be required for the transmission of such frequencies.

138. The Purington patent did not expressly state that the sharply resonant receiver which was particularly described was to be increased in bandwidth when the receiver was used for telephony.

139. The Purington patent did not show any kind of limiter circuit.

140. A limiter could not be used in the embodiments of a receiver particularly described in the Purington patent.

141. The apparatus and system of the Purington patent were never described or reported upon in any engineering journal.

142. The Purington patent did not disclose the system of frequency modulation defined in Findings 13, 20 and 21.

DOME PATENT 1,917,102
Filed July 22, 1929–Issued July 4, 1933
Corresponding Australian Patent 27,934
Accepted January 12, 1931

143. The Dome patent related to a frequency modulation transmitter and did not disclose anything concerning the operating characteristics or structure of a frequency modulation receiver.

144. The Dome patent did not contain any express reference to the problem of noise in radio signaling and did not contain any teaching concerning how noise might be reduced.

145. The Dome patent did not state or suggest that the variation in frequency at the transmitter should be greater than the range of modulating frequencies or the audible frequency range to be transmitted and received.

146. The Dome patent did not expressly distinguish between what is now called the swing (peak-to-peak variation in frequency) and the deviation, defined as the variation from center frequency of the carrier.

147. The example of a change of frequency of 20,000 cycles referred to on page 3 of the Dome patent was an example of a total variation in frequency (peak-to-peak swing of the carrier) that might be obtained by multiplication at the transmitter.

148. The Dome patent expressly mentioned a modulating frequency of 20,000 cycles.

149. The Dome patent disclosed erroneously that the effect of the side bands caused by amplitude modulation in the transmitter might be removed by the action of the multipliers in multiplying the frequencies of the side bands beyond the range of audibility.

150. The Dome patent did not teach that the bandwidth of a frequency modulation transmitter or receiver should be greater than the bandwidth in amplitude modulation for transmitting and receiving a comparable audible frequency range.

151. The Dome patent did not disclose the system of frequency modulation described in Findings 13, 20 and 21 herein.

152. The teaching in the Dome patent did not lead the General Electric Company, its owner, or any other company or person to build and operate any frequency modulation system.

### VAN DER POL ARTICLE

153. The article written by Baeth Van der Pol, a Dutch mathematical physicist, and published by the Institute of Radio Engineers in 1930, was a mathematical treatment and analysis of the side frequencies which may occur when a carrier frequency is varied in frequency at any particular rate. The Van der Pol article was expressly directed to the problem of the disturbances which such variations in frequency might cause in radio signaling as when signaling by amplitude modulation.

154. The Van der Pol article did not disclose the form of a frequency modulated wave or the side frequencies which would be present when the carrier was modulated by more than one frequency at a time.

155. The Van der Pol article did not disclose anything concerning the reception of frequency modulated waves and the reproduction of signals therefrom.

156. The Van der Pol article did not suggest anything at all concerning the peak-to-peak swing or the deviation which might be employed or ought to be employed in a practical frequency modulation system.

### DEMAREST PATENT 3,047,312

#### Filed Dec. 1, 1926
#### Issued July 14, 1936

157. The Demarest patent, owned by the American Telephone and Telegraph Company, proposed the use of frequency modulation to reduce the effects of fading in radio signaling.

158. Demarest did not build any apparatus in connection with the disclosure of the Demarest patent.

159. The Demarest patent disclosed that conventional circuits were to be employed for the radio frequency and intermediate frequency stages of the receiver.

160. In 1926, a characteristic of conventional radio frequency and intermediate frequency stages was that the circuits would be as sharply selective as possible and that the bandwidth of the receiver would be confined to the band required to pass the audible frequency range to be transmitted and received.

161. The Demarest patent suggested the use of a limiter in the receiver to remove the effects of fading.

162. The limiter suggested in the Demarest patent was a limiter such as was shown in a textbook by Van der Bijl. Such a limiter would be effective for reducing the effects of fading but would not be effective to reduce the effects of tube disturbances and other spectrum-like disturbances.

### WRIGHT PATENT 1,964,375

#### Filed Feb. 20, 1926
#### Issued June 26, 1934

163. The Wright patent disclosed a proposal for transmitting and receiving pictures by frequency modulation.

164. The Wright patent was directed primarily to the problem of removing the effects of fading and refers, incidentally, to removing the effects of static and strays.

165. The Wright patent referred to employing a limiter in a receiver and did not disclose any structural characteristics for such limiter.

166. The Wright patent disclosed that the function and purpose of the limiter in the receiver was to remove amplitude variations caused by fading.

167. The Wright patent did not state anything at all concerning the swing or extent of frequency variation which was to be employed.

168. The Wright patent did not expressly disclose whether the bandwidth was to be the same or different from the bandwidth which would be required in transmitting pictures by amplitude modulation.

169. The Wright patent did not state anything concerning tube noise or other spectrum-like disturbances which might be generated in the receiver.

170. The Wright patent did not disclose the system for frequency modulation having characteristics such as are set forth in Findings 13, 20 and 21 herein.

171. There is no evidence that the Wright patent led to the construction or use of any radio apparatus.

CONRAD PATENT 2,057,640

Filed March 17, 1927
Issued Oct. 13, 1936

172. The Conrad patent disclosed a proposal for using frequency modulation in radio communication whereby the receiver might be more selective and have a narrower band than would be required in communication by amplitude modulation.

173. The apparatus described in the Conrad patent was tried out by Westinghouse Electric Manufacturing Company at radio station KDKA in an effort to narrow the bandwidth and the channel required for broadcasting. The effort to narrow the band for broadcasting in that manner was unsuccessful and was abandoned.

174. The Conrad patent did not refer to a limiter in the receiver and a limiter could not have been employed in the embodiment of a receiver which the patent described.

175. The Conrad patent did not have any impact on the art.

176. The Conrad patent did not disclose a frequency modulation system having the characteristics set forth in Findings 13, 20 and 21, herein.

EHRET PATENT 705,803

Filed Feb. 10, 1902
Issued March 28, 1905

177. The Ehret patent was one of the earliest patents in which it was proposed to transmit and receive intelligence by varying the frequency of a radio wave.

178. The Ehret patent did not teach anything at all concerning the problem of reducing static and noise in radio signaling. It did not refer to, or suggest anything concerning, the bandwidth to be employed in frequency modulation or the extent of variations in frequency to be employed. It did not refer to or suggest limiting in a frequency modulation receiver.

179. There is no evidence that the Ehret patent had any impact upon the art.

ARMSTRONG PATENT 1,941,447

Filed May 18, 1927–Issued Dec. 26, 1933
Corresponding British Patent 290,642
accepted July 18, 1929

180. Armstrong British Patent 290,-642 was accepted July 18, 1929. It corresponds to and has essentially the same disclosure as Armstrong 447. The British patent issued early enough to be a statutory bar to the 069 patent.

181. For convenience the 447 patent will be referred to rather than the corresponding British patent, but all findings on either one apply to both.

182. The 447 patent discloses an invention for eliminating the effects of fading and static in radio telephone transmission.

183. The 447 patent teaches that the narrower the band the less will be the

effect of static, implying that where static is a problem the band should be narrowed.

184. The 447 patent did not disclose that tube noise and other spectrum-like disturbances might cause a variation in frequency and that in the presence of a strong carrier such variations in frequency would be limited in extent insofar as they were capable of producing an audible response.

185. The 447 patent taught that the frequency modulation system disclosed therein could and should be operated on a bandwidth less than the bandwidth required for amplitude modulation.

186. The limiter in the 447 patent was for the express purpose of removing amplitude variations caused by fading and for that purpose it would have been effective.

187. The limiter disclosed in the 447 patent was not effective to remove amplitude variations caused by tube noise and other spectrum-like disturbances.

188. A receiver built in accordance with the specific instruction of the 447 patent would not be capable of operation or of adjustment to operate over a bandwidth several times the bandwidth required for amplitude modulation.

189. The 447 patent did not disclose the system of frequency modulation described in Findings 13, 20 and 21 herein.

190. The 447 patent did not disclose a receiver with the structure and characteristics set forth in Finding 13(b), (c) and (d) and Findings 20 and 21 herein.

191. Major Armstrong assigned the 447 patent to Westinghouse Electric & Manufacturing Company and that assignment was made pursuant to his obligations under an agreement dated June 15, 1923.

192. Emerson was not licensed by Armstrong under the 447 patent. Emerson was, however, validly licensed thereunder by Radio Corporation of America.

SUMMARY

193. The prior art did not disclose that noise could be suppressed or reduced by employing frequency modulation with a bandwidth at the transmitter and receiver substantially greater than the bandwidth required in amplitude modulation.

194. None of the prior art references disclosed that the bandwidth for a frequency modulation receiver should be greater than the bandwidth for an amplitude modulation receiver operating on the same frequencies.

195. In none of the prior art references was there any express teaching that the peak-to-peak swing or total variation in frequency should be greater than the range of audible frequencies or modulating frequencies to be reproduced at the receiver.

196. None of the prior art references disclosed that tube and thermal noise in the receiver and other spectrum-like disturbances could manifest themselves as a frequency variation in the received signaling wave and that such frequency variations would in the presence of a strong carrier be limited in extent insofar as they are capable of producing an audible response from the receiver.

197. None of the prior art references expressly taught that tube noise and spectrum-like disturbances could manifest themselves as amplitude variations on the carrier.

198. None of the prior art references disclosed that frequency modulation in any form would be capable of suppressing or substantially reducing the audible effect of tube noise, thermal noise, and other spectrum-like disturbances.

199. None of the prior art references disclosed the formula for the improvement obtainable with wide band frequency modulation as compared with amplitude modulation set forth in Finding 22 herein or the substance thereof.

200. None of the prior references disclosed the term "deviation ratio" or the concept embodied therein which related

the deviation employed in a frequency modulation system to the audible frequency range for the system.

### Was There Infringement?

TELEVISION SOUND RECEIVERS

201. Each of the television receivers designated as Model No. 614 and as Model No. 571 contains a sound channel frequency modulation receiver capable of receiving frequency modulated waves sent out by television sound transmitters which furnish broadcasting service in accordance with the Rules of the Federal Communications Commission and is capable of producing a sound signal from said frequency modulated waves.

202. Each of the receivers designated as Model No. 614 and as Model No. 571 is capable of responding to such frequency modulated waves referred to in the foregoing Finding 201 herein when said waves are modulated to have a deviation of $\pm$ 25 kilocycles or a peak-to-peak swing of 50 kilocycles.

203. For television broadcasting, a deviation of $\pm$ 25 kilocycles (or peak-to-peak swing of 50 kilocycles) is defined as 100 percent modulation in the Rules of the Federal Communications Commission. Those Rules specify that the percentage of modulation shall in no case be less than 85 percent nor more than 100 percent on peaks of frequent recurrence during any selection which normally is transmitted at the highest level of the program under consideration.

204. In each of the receivers designated as Model No. 614 and as Model No. 571, the effective bandwidth of all the radio frequency stages and intermediate frequency stages is at least 50 kilocycles.

205. Each of the receivers designated as Model No. 614 and as Model No. 571 contains a limiter stage which eliminates and substantially limits amplitude variations in the received modulated wave caused by tube noise and other disturbances.

206. In the television receiver designated as Model No. 614, the received frequency modulated signal is amplified in one radio frequency amplifying stage and in each of four intermediate frequency amplifying stages before being applied to the limiter stage.

207. In the receiver designated as Model No. 571 the received frequency modulated signal is amplified in one radio frequency amplifying stage and in each of two intermediate frequency stages before being applied to the limiter stage.

208. Each of the television receivers designated as Model No. 614 and as Model No. 571 contains a discriminator which is responsive over the complete range of the peak-to-peak swing of the signal described in Findings 201, 202 and 203 herein.

209. Each of the television receivers designated as Model No. 614 and as Model No. 571 effectively reproduces the audio signal over a range with an upper limit of about 5,000 cycles or less.

210. Emerson in its design of such receivers has provided for an effective audible frequency range which is the same as is normally provided in receivers for the Standard Broadcast Band.

211. Each of the receivers designated as Model No. 614 and as Model No. 571 is capable of suppressing noise to a degree which, at many locations, would be readily perceptible to the listener as compared with what could be achieved with reception in an amplitude modulation system at the same frequency and power.

212. In 1948 and 1949, Emerson advertised its television receivers as containing FM circuits which would provide reception free from noise and clear of static.

FM BROADCAST RECEIVERS

213. Each of the frequency modulation broadcast receivers designated as Model No. 557 (chassis 120048B) and as Model No. 586 (chassis 120023B) are capable of receiving frequency modulated waves sent out by frequency modulation radio transmitters which furnish broadcasting service in accordance with the Rules of the Federal Communications Commission and is capable of reproduc-

ing a sound signal from said frequency modulated waves.

214. Each of said receivers designated as Model No. 557 and as Model No. 586 is capable of responding to such frequency modulated waves referred to in the foregoing Finding 213 herein when said waves are modulated to have a deviation of ± 75 kilocycles or a peak-to-peak swing of 150 kilocycles.

215. For FM broadcasting, a deviation in frequency of ± 75 kilocycles (or peak-to-peak swing of 150 kilocycles) is defined as 100 percent modulation in the Rules of the Federal Communications Commission. Those Rules specify that the percentage of modulation shall be maintained as high as possible consistent with good quality of transmission and good broadcast practice and in no case less than 85 percent nor more than 100 percent on peaks of frequent recurrence during any selection which normally is transmitted at the highest level of the program under consideration.

216. The effective bandwidth of all the radio frequency stages and intermediate frequency stages is at least 150 kilocycles.

217. Each of the said receivers designated as Model No. 557 and as Model No. 586 contains a limiter stage which eliminates and substantially limits amplitude variations in the received modulated wave caused by tube noise and other disturbances.

218. In the said receiver designated as Model No. 557, the received frequency modulated signal is amplified in two intermediate frequency amplifying stages before being applied to the limiter stage.

219. In the Emerson FM receiver designated as Model No. 586, the received frequency modulated signal is amplified in one radio frequency amplifying stage and in each of two intermediate frequency stages before being applied to the limiter stage.

220. Each of the said frequency modulated receivers designated as Model No. 557 and as Model No. 586 contains a discriminator which is responsive over the complete range of the peak-to-peak swing described in Findings 214 and 215 herein.

221. Emerson in its advertising has stated that there is noise quieting in its FM receivers.

222. Each of the broadcast receivers designated as Model No. 557 and as Model No. 586 is capable of suppressing noise and interference from other radio transmissions to a substantial degree as compared with what could be obtained with an amplitude modulation receiver operating at the same frequency and field strength and reproducing the same audible frequency range.

SUMMARY

223. The aforementioned television receivers and FM broadcast receivers were manufactured and sold by Emerson in the form and condition in which they were advertised and sold at retail to the ultimate user. In the normal and expected use of such receivers in receiving FM sound programs, the user would not make any change or adjustment in the circuit characteristics which are specified in the foregoing Findings 201, 202, 204–211, 213, 214, 216–220, 222 herein.

224. Emerson has tested each type and model of its television receivers and FM broadcast receivers by tuning such receivers to FM broadcast and television sound signals on the air and listening to such receivers under conditions similar to those which would be encountered during operation of the receivers by the public.

225. The foregoing television sound receivers embody the system of frequency modulation described in Findings 13, 20 and 21 herein.

226. The foregoing FM broadcast receivers embody the system of frequency modulation described in Findings 13, 20 and 21 herein.

227. The foregoing television sound receivers were manufactured by Emerson for operation in accordance with the system of frequency modulation described in Findings 13, 20 and 21 herein.

228. The foregoing FM broadcast receivers were manufactured by Emerson for operation in accordance with the system of frequency modulation described in Findings 13, 20 and 21 herein.

229. The FM circuits in the Emerson broadcast receivers and television receivers concerning which evidence was introduced at the trial do not have any practical use except for receiving transmissions from FM broadcast stations and television stations.

### PART II

*The 066 Patent*

### The Discovery

230. The 066 patent relates to a system and principle of operation for a frequency modulation receiver.

231. The principle of operation consists in heterodyning the received frequency modulated wave with itself to reproduce the signal.

232. The principle of operation consists in combining or beating at the detector the received radio wave, which is dynamically varying in frequency in accordance with the signal, with the same received wave which has been modified to include phase differences or variations in amplitude in accordance with the variations in frequency of the received wave. The combined waves produce a variation in amplitude at the detector in accordance with the signal which is rectified by the detector and the signal is thereby reproduced.

233. A frequency modulation receiver operating in accordance with the aforementioned principle is characterized by having at least two paths in the receiver for the received modulated wave, in each of which paths the received wave is transmitted to the detector and in one of which paths a variation in phase or change in amplitude of the currents derived from the received wave is produced in accordance with the variations in frequency of the received wave. The currents from each of the two paths are then combined at the detector (or each of the detectors if there are two detectors in the receiver) to reproduce the signal.

234. A receiver embodying the aforementioned principle of operation is characterized by the presence of a circuit for providing a response to variation in frequency of the received wave which is tuned to, or adjusted to be non-reactive at, the center frequency of the received wave. Such a receiver is characterized by the absence of circuits tuned to frequencies above and below the carrier frequency for providing a response to variations in frequency of the received wave, such off-tuned circuits being illustrated in the Conrad patent, the Purington patent, the Demarest patent and the 447 patent.

### The Disclosure

235. The 066 patent describes a particular embodiment of a frequency modulation receiver for telephony with a network which, except for the action of any resistance that may be present, is non-reactive at the center frequency of the received wave.

236. In the particular embodiment disclosed in the 066 patent, there are two paths for the received wave to each detector. One of those paths is through the amplifier stages (61 or 62 of Fig. 2 of the 066 patent) to each of the detectors. The other path is through stage 70 (Fig. 2, supra) to each of the detectors.

237. On the assumption that there is no effective resistance in the network 58, 59, 60 (Fig. 2, supra), the combination of the waves at each of the detectors is correctly shown in Defendant's Exhibit Z.

238. On the assumption that there is effective resistance in the network 58, 59, 60, the combination of the waves at each of the detectors is correctly shown in Plaintiff's Exhibit 123.

239. The 066 patent does not state that the resistance in network 58, 59, 60 must be zero for practical operation of the circuit.

240. If resistance in the network 58, 59, 60 were completely neutralized, the

network would produce variations in amplitude in accordance with variations in frequency of the received wave and there would be a reversal in phase at the center frequency.

241. If resistance is present in network 58, 59, 60, a continuous variation in phase with variation in frequency of the received wave may be produced as shown in Defendant's Exhibit AA and Plaintiff's Exhibit 42C.

242. It was well known in 1930 when the application for the 066 patent was filed, that in a circuit such as is shown in Fig. 2 of the 066 patent, a transformer could be substituted for the stages 61, 62 and 70 as shown in Plaintiff's Exhibit 124 and that the circuit would be operative after such substitution.

### The Impact

243. The principle for a frequency modulation receiver of heterodyning the received wave which was dynamically varying in frequency with itself to reproduce the signal was a principle, the practicality of which could not have been predicted on the basis of existing theory in 1930 for the reception of frequency modulated waves.

244. The principle of heterodyning the received wave with itself as set forth in Findings 231 and 232 herein is utilized in the Foster-Seeley discriminator.

245. The Foster-Seeley discriminator, the circuit of which is illustrated in Fig. 2 of Seeley Patent 2,121,103 and the operation of which is described in that patent, is in wide use in this country in FM broadcast receivers and television sound receivers.

### The Claims and Their History

#### THE CLAIMS

246. Each of claims 8, 9 and 10 is specifically directed to a system or method for receiving frequency modulated waves.

247. Each of the claims 8, 9 and 10 require that there shall be at least two paths in the receiver for passing the received frequency modulated wave or currents derived therefrom to the detector.

248. Claim 8 requires that the waves from the separate paths shall be heterodyned with each other. That means that the waves shall be combined with each other before or in a detector.

249. Each of claims 9 and 10 require that the currents from the separate paths shall be combined with each other in the detector.

250. Claim 8 requires that there shall be a combination of reactance elements in one of the paths referred to therein. In the light of the specification, the meaning is that the combination of reactance elements (illustrated in the specification as network 58, 59, 60 of Fig. 2) shall produce a variation in phase or variation in amplitude in accordance with the variation in frequency of the received wave.

251. Claim 9 requires that the two paths shall have different characteristics of transmission for the received frequency modulated wave. In the light of the specification, the meaning is that in one of the paths, there shall be produced a variation in phase or variation in amplitude in accordance with the variation in frequency of the received wave.

252. Claim 10 requires that in one of the paths the phase of the current shall be changed with respect to that of the current in the other path. In the light of the specification, the meaning is that the current shall be changed in phase in accordance with variations in frequency of the received wave.

253. Each of claims 8, 9 and 10 particularly points out and distinctly claims the system and principle of operation for a frequency modulation receiver set forth in Findings 230 and 233 herein.

#### THE HISTORY OF THE CLAIMS

254. The application as filed on July 30, 1930, contained, inter alia, the following proposed claims:

(1) The step in the method of detecting frequency modulated waves which consists in subjecting a

current derived from said waves to the heterodyning action of a second current also derived from said waves.

(3) In combination, a circuit for receiving frequency modulated waves, means for deriving from said waves a plurality of currents, and means for subjecting one of said currents to the heterodyning action of the other. (File Wrapper Defendant's Exhibit B, Paper No. 1.)

The aforementioned original claims pointed broadly to the principle of receiving a frequency modulated wave by heterodyning the received wave with itself, when each of the heterodyning waves was varying dynamically in frequency.

255. In arguing for allowance of claims, Armstrong's attorneys told the Patent Office:

"The principal idea of the present case is to take the received wave and derive from it two currents, one of which is fed into a device which converts the variations of amplitude which is then combined with the other current of variable frequency and constant amplitude, the second current in this case acting as a synchronous or zero-beat heterodyne." (Exhibit B, page 23.)

256. Claims 8, 9 and 10 of the 066 patent here in suit were involved in an interference with an application for patent of Crosby, owned by RCA, having Serial No. 618,154, filed June 20, 1932 and which resulted in Crosby Patent No. 2,229,640 (Defendant's Exhibit B File Wrapper, Papers No. 9 and 11; Plaintiff's Exhibit 31).

257. In the interference proceeding, RCA contended that the disclosure in the 066 patent should be confined to an embodiment as illustrated in Fig. 2 of the 066 patent in which the resistance in the network 58, 59, 60 was zero.

258. The Board of Examiners on Appeal held in the interference proceeding that the disclosure in the 066 patent was not limited to the particular embodiment

described in the preceding Finding 257 herein.

259. In awarding priority to Armstrong on an embodiment in which resistance was present in the reactance network, the Board held in effect that the 066 patent disclosed the operation of a circuit in which a continuous variation in phase with frequency was produced in one of the paths.

260. Crosby Patent No. 2,229,640 and the application therefor as filed disclosed (1) circuits for a frequency modulation receiver in which a continuous variation in phase with frequency in one of the paths was produced (illustrated in Figs. 1 and 3a of the Crosby patent) and (2) circuits for a frequency modulation receiver in which a variation in amplitude in accordance with variations in frequency of the received wave was produced in one of the paths accompanied by a reversal in phase at the center frequency (illustrated in Fig. 3 and Fig. 1 when operated with an undamped or open circuit transmission line).

261. Crosby Patent No. 2,229,640 stated in substance that all of the embodiments of the receivers referred to in Finding 260 herein operate in substantially the same manner (640 patent, p. 2, col. 2, line 36 to p. 3, col. 1, line 15).

262. Fig. 3A of Crosby Patent No. 2,229,640 illustrated a circuit for a frequency modulation receiver which operates in substantially the same manner as the Foster-Seeley discriminator and the circuit illustrated in Fig. 2 of Seeley Patent No. 2,121,103.

263. In awarding priority to Armstrong over Crosby with respect to the subject matter of claims 8, 9 and 10 here in suit, the Board of Examiners of the Patent Office held in an adversary proceeding that the 066 patent covered a frequency modulation receiver in which variations in phase were produced in one of the paths in accordance with the variations in frequency of the received wave.

264. The Board of Examiners of the Patent Office held in effect that there is not a fundamental difference in opera-

tion between a receiver as illustrated in Fig. 2 of the 066 patent and described in that patent and a receiver circuit as illustrated in Figs. 1 and 3A of Crosby Patent No. 2,229,640 in which a continuous variation in phase in accordance with the variation in frequency of the received wave is produced in one of the paths leading to the detector.

### The Prior Art

#### HORTON PATENT 1,856,707

Filed March 28, 1928

Issued March 3, 1932

265. The Horton patent related to circuits for a frequency measuring instrument (Horton Patent 1,856,707, p. 1, col. 1, lines 1–13).

266. The Horton patent did not expressly disclose anything about a frequency modulation receiver and did not state anything at all concerning the problem of detecting a wave which was dynamically varying in frequency.

267. The Horton patent disclosed circuits for measuring the frequency of a wave which was of constant frequency.

268. The frequency measuring circuits specifically described in the Horton patent would be inoperative to provide a measure of frequency unless the circuits were so sharply tuned as to exclude the side frequencies accompanying a modulated wave.

269. The circuit illustrated in Fig. 4 of the Horton patent, which defendant's expert testified was essentially the same in circuit arrangement as the circuit illustrated in Fig. 2 of Seeley Patent No. 2,121,103, would be inoperative as a frequency measuring instrument.

270. The circuit illustrated in Fig. 4 of the Horton patent differed from the circuit illustrated in Fig. 2 of the Seeley patent (assuming that the Seeley circuit were adapted for use as a frequency measuring instrument) in that the Horton circuit did not have a tuned secondary circuit to provide a phase difference between the wave in the primary and the wave in the secondary when the incoming frequency was different from the frequency to which the circuits were tuned.

271. The Horton patent did not disclose a frequency modulation receiver in which the received frequency modulated wave was heterodyned with itself to produce currents which activated the detector to reproduce the signal.

272. To produce a useful result from the Horton circuits as specifically described, the primary circuits would be manually tuned to the frequency of the incoming wave and a reading of the frequency would be taken.

273. The Horton patent did not disclose a frequency modulation receiver embodying the principle of operation described in Findings 230 to 233 herein.

#### ARMSTRONG PATENT 1,941,447

274. The 447 patent did not disclose two paths for the received wave leading to each detector.

275. The 447 patent did not disclose a frequency modulation receiver in which the received wave was heterodyned with itself to provide currents which activate each detector.

#### HANSELL PATENT 1,867,567

Filed Feb. 1, 1929

Issued July 19, 1932

276. The Hansell patent disclosed circuits for a frequency modulation receiver, but it did not disclose circuits in which there were two paths for the received wave leading to each detector.

277. None of the circuits disclosed in the Hansell patent depended upon combining the waves from two paths to produce a wave which would activate each detector.

278. The Hansell patent stated (at p. 2, col. 1, lines 55–68) that the "invention" in its broadest aspect provides a method of measuring frequency. It does not follow that, in 1929 or at any time since then, a frequency measuring instrument could be used to perform the function of a frequency modulation receiver or that a person skilled in the art

would have believed that a frequency measuring instrument would be capable of such use.

CONRAD PATENT 2,057,640

Filed March 17, 1927

Issued Oct. 3, 1936

279. The Conrad patent did not disclose a circuit for a frequency modulation receiver in which the received frequency modulated wave was combined or heterodyned with itself to produce the current which activated each detector.

280. The Conrad patent disclosed circuits in which the output currents from each detector were balanced against each other (Conrad patent, Fig. 4, p. 2, col. 1, lines 41–53).

SUMMARY

281. None of the prior art references disclosed the system or principle of operation for a frequency modulation receiver set forth in Findings 230 to 233 herein.

**Was There Infringement?**

282. Each of the television sound receivers in Model No. 614 (chassis 120110B) and Model No. 571 (chassis 120066) and each of the FM broadcast receivers designated as Model No. 557 (chassis 120048B) and Model No. 586 (chassis 120023B) contains essentially the same circuit arrangement for the discriminator and detectors. That circuit arrangement is known in the art as the "Foster-Seeley" discriminator.

283. The principal structural components and operation of the Foster-Seeley discriminator are illustrated in Plaintiff's Exhibit 40, pp. 4, 5, 6 and in Fig. 2 of Seeley Patent No. 2,121,103.

284. Some of the principal structural components of the Foster-Seeley detector comprise (a) a primary coil across which is impressed the received wave to be detected, (b) a secondary coil inductively coupled to the primary coil and tuned during operation to the center frequency of the received wave, (c) direct leads from each of the two ends of the secondary coil to the anodes of the detectors, (d) a lead from the top of the primary for conducting radio frequency currents without the action of inductive reactance to the midpoint of the secondary coil from which point such radio frequency currents may proceed to the anodes of the detectors through the respective halves of the secondary coil and (e) leads from the bottom of the primary coil, through ground or otherwise to the cathodes of the detectors and (f) a lead for radio frequency currents from the cathodes of the detectors through resistances to the center tap on the secondary coil (Plaintiff's Exhibit 40, pp. 4, 5, 6 and Fig. 2 of Seeley Patent No. 2,121,103).

285. A radio frequency wave varying in phase in accordance with variations in frequency of the received wave is applied at the anode of each detector through the inductive coupling of the primary coil and secondary coil and the action of the tuned secondary circuit.

286. A radio frequency wave which is fixed in phase with respect to variations in frequency of the received wave is applied to the anode of each detector from across the primary coil and through the lead for radio frequency currents to the center tap of the secondary coil.

287. The radio frequency waves referred to in Findings 285 and 286 herein are combined or heterodyned at each detector.

288. The path for the radio frequency wave with varying phase includes the inductive field between the primary and secondary in the Foster-Seeley discriminator. That path does not include the lead for radio frequency currents from the primary coil to the center tap on the secondary coil.

289. The path for the radio frequency wave of fixed phase which reaches the anode of each detector does not include the inductive field between the primary and the secondary. That path includes the lead for radio frequency currents from the primary coil to the center tap on the secondary coil.

290. Each of the waves applied to the anodes of the detectors and referred to in Findings 285 and 286 herein varies

in frequency in accordance with the variations in frequency of the received wave.

291. In the Foster-Seeley discriminator, there is a combination of reactance elements which produces a variation in phase in accordance with the variations in frequency of the received wave. Those elements are the tuned secondary circuit and the inductive coupling connection between the primary and secondary.

## PART III

### The Reissue Patent 21,660

#### The Discovery

292. The discovery relates to the use of preemphasis and deemphasis in the wide band frequency modulation system disclosed in the 069 patent.

293. The basic characteristics of the preemphasis and deemphasis system are as follows:

1. The modulating frequencies at the transmitter are predistorted in such manner as to increase the level of modulation for the higher modulating frequencies without substantially affecting the level of modulation for the lower modulating frequencies where most of the energy in voice and music occurs and without changing the overall swing of the transmitted wave.

2. A restorer network is provided at the receiver to compensate for the distortion of the signal at the transmitter.

3. The admittance band of the discriminator of the receiver is made substantially wider than the swing in frequency of the received wave and the width is increased until distortion from the action of the discriminator and detector disappears.

294. In the preemphasis and deemphasis system defined in the preceding Finding, the preemphasis is of a particular kind and is substantially in accord with the characteristic of a resistance-capacitance network having a time constant of about 75 to 100 microseconds.

295. The aforesaid preemphasis and deemphasis system embodies Armstrong's discovery that distortion at the receiver, which had theretofore been observed when preemphasis was tried at the transmitter, could be avoided and cured by the particular expedient of increasing the admittance band of the discriminator.

296. Preemphasis and deemphasis as described in Findings 292 to 294 herein, when applied in FM broadcasting and television sound broadcasting, results in a reduction in noise and a substantial improvement in the over-all signal-to-noise ratio at the output of the receiver.

#### The Disclosure

297. The Reissue patent stated the general subject matter thereof as follows:

"The invention relates to the introduction of a distorting network at the transmitter and a restoring network at the receiver together with the provision of certain detector characteristics in such manner as to produce a great improvement in the quality of transmission."

298. The Reissue patent disclosed a particular characteristic for the predistortion to be employed at the transmitter. That predistortion was shown in Fig. 5 of the Reissue patent and results in amplification of modulating frequencies from about 12,000 to 15,000 cycles by about 10 times as compared with modulating frequencies from about 500 to 1,000 cycles.

299. The particular predistortion disclosed in the Reissue patent and illustrated in Fig. 5 thereof results in distortion of typical audible frequencies occurring in the human voice as shown in Plaintiff's Exhibit 131.

300. The particular predistortion disclosed in the Reissue patent is in accord with the characteristic of a resistance capacity network having a time constant of 75 microseconds.

301. The Reissue patent disclosed that distortion may occur at the receiver,

particularly when the higher modulating frequencies at the transmitter have been accentuated.

302. The Reissue patent disclosed that such distortion may result primarily from (1) lack of linearity of the detector characteristic and (2) destruction of the form of the higher modulating frequencies by cross-modulation with noise or by over-modulation at the detector.

303. The Reissue patent disclosed that in the system described therein it is not necessary to lower the level of modulation, in other words, to reduce the peak-to-peak swing, and thereby lose signal-to-noise ratio in order to avoid such distortion.

304. The Reissue patent disclosed that such distortion might be avoided by the particular expedient of widening the admittance band of the discriminator to such an extent that the over-modulation and cross-modulation at the detector illustrated in Figures 7 and 8 of the patent would not occur.

305. The Reissue patent disclosed a restorer network for the receiver to compensate for the particular predistortion described for the transmitter.

### The Impact

306. The preemphasis system specifically disclosed in the Reissue patent, namely, preemphasis having the characteristic of a network with a time constant of about 75 microseconds, was adopted by the Federal Communications Commission for FM broadcasting and television sound. Such preemphasis at the transmitter and corresponding deemphasis at the receiver is now in general use in those services.

307. In both frequency modulation and amplitude modulation, the accentuation of the higher modulating frequencies by predistortion at the transmitter aggravates the problem of distortion at the receiver.

308. Armstrong's teaching that distortion in an FM receiver might be prevented by substantially widening the admittance band of the discriminator was not foreshadowed in theoretical studies concerning the bandwidth required in receiving a frequency modulated wave.

309. Armstrong's teaching that the admittance band of the discriminator should be substantially greater than the peak-to-peak swing of the signal was a practical solution for the problem of distortion at the receiver.

310. Because of the difficulties involved in analyzing the form of a frequency modulated wave when modulated by a complex signal, the source of such distortion at the receiver had not been recognized or understood.

311. Armstrong's teaching that such distortion could be prevented by substantially widening the admittance band at the receiver has had an impact on the general practice of receiving frequency modulated waves.

### The Claims and Their History

#### THE CLAIMS

312. Each of the claims 1 and 2 requires that the high frequencies in the band of signaling frequencies shall be amplified to a substantially greater degree than the low frequencies in such band. The meaning is that there shall be predistortion at the transmitter substantially as described in the specification.

313. Each of claims 4 and 6 requires that the lower frequencies in the audio currents from the detector at the receiver shall be amplified to a substantially greater degree than the signaling currents of the higher frequencies. The meaning is that the receiver shall include a restorer network which shall compensate for predistortion at the transmitter substantially in accordance with the characteristic described in the specification (p. 4, col. 1, line 32 to col. 2, line 2 and p. 4, col. 2, lines 30–32).

314. Claim 1 requires that the transmitted wave shall comprise a wide band of frequency variations (p. 3, col. 2, lines 38–40). Claim 2 requires means for varying the carrier wave over a wide range (p. 3, col. 2, lines 61–62). The meaning is that the transmitted wave

shall be a wide swing wave as described in the 069 patent and then on the air from Major Armstrong's Alpine Station.

315. Each of claims 4 and 6 refer to the wide swing of the received wave (p. 4, col. 1, lines 29–30, p. 4, col. 2, lines 24–25). The meaning is that the receiver shall be a wide band receiver as disclosed in the 069 patent and as employed by Major Armstrong and others in receiving transmissions from the Alpine Station and other experimental FM stations then on the air.

316. Claim 1 requires that the detecting device shall have an admittance band substantially wider than said wide band of frequency variations. The meaning is that the discriminator and detector shall be substantially widened as compared with the peak-to-peak swing and thereby avoid the distortion described in the specification.

317. Claim 2 requires that the discriminator shall have an admittance bandwidth substantially greater than the width of the said wide range of carrier frequencies (p. 3, col. 2, lines 65–70). The meaning is that the discriminator shall have an admittance band substantially greater than the peak-to-peak swing of the signal in accordance with the teaching of the specification and thereby avoid the distortion disclosed in the specification.

318. Each of claims 4 and 6 require that the discriminator or the detecting device shall have an admittance band substantially greater or wider than the width of the wide swing of the received wave. The meaning is that the admittance band of the discriminator shall be made substantially greater than the peak-to-peak swing of the received wave in accordance with the teaching of the specification and thereby avoid the distortion referred to in the specification.

319. The words "substantially wider" or "substantially greater" appearing in claims, 1, 2, 4 and 6 of the Reissue patent with respect to the admittance band emphasize that the greater width of the admittance band is of significance in the combination and not merely trivial or incidental.

THE HISTORY OF THE CLAIMS

320. Claims 1, 2, 4 and 6 here in suit and the other claims of the Reissue patent were involved in an interference proceeding in the United States Patent Office with an application of Hansell, owned by RCA, having Serial No. 297,777 and which issued as Hansell Patent No. 2,465,448 on March 29, 1949.

321. The Hansell 448 patent disclosed a system of predistortion in which the modulating frequencies below 3,000 cycles are amplified to a greater extent than the higher modulating frequencies from 5,000 cycles to 10,000 cycles.

322. The system of predistortion disclosed in the Hansell patent would be inoperative and is not used in FM broadcasting.

323. Armstrong was awarded priority over Hansell in the interference proceeding.

324. The Board of Interference Examiners held that the Hansell application did not disclose the type of predistortion disclosed in the Reissue patent and covered by the claims thereof.

325. The Board of Interference Examiners held that the Hansell application had not disclosed the substantially wider admittance band for the discriminator disclosed and claimed in the Reissue patent when considered as a part of the entire combination disclosed and claimed in the Reissue patent.

326. The Board of Interference Examiners found that Armstrong's proofs were persuasive that he had first used the preemphasis and deemphasis system disclosed in the Reissue patent as early as 1936 but did not hold that Armstrong had reduced the system to practice in 1936 because of the rule requiring independent corroboration which applies in interference proceedings.

327. The only change in the specification of the Reissue patent as compared with the specification of the original patent No. 2,215,284 was the correc-

tion of the following palpable error in language: On page 1 of the Reissue patent, column 2, lines 31–32, the words "improvement in both the fidelity and signal to noise ratio" were substituted for the words "increase in both the fidelity and noise level" which appeared in the original patent.

328. The only change in the claims of the Reissue patent as compared with the claims in original patent No. 2,215,284 is that claims 4, 5 and 6 appear in the Reissue patent and do not appear in the original patent No. 2,215,284.

329. Claims 4, 5 and 6 of the Reissue patent point out the same elements of a frequency modulation receiver and method of receiving frequency modulated waves as are pointed out in claims 1, 2 and 3 of the Reissue patent.

330. The only significant difference between claims 1, 2 and 3 of the Reissue patent as compared with claims 4, 5 and 6 thereof is that claims 1, 2 and 3 cover a transmitter and receiver in combination (claims 2 and 3) or a method of transmitting and receiving (claim 1); whereas claims 4, 5 and 6 cover a receiver (claims 4 and 5), or a method of reception (claim 6), for receiving a frequency modulated wave which has been predistorted as provided in claims 1, 2, and 3.

331. There is no evidence that Emerson manufactured any FM receivers in 1940 or earlier.

### The Prior Art

#### USSELMAN PATENT 1,794,932

Filed Sept. 1, 1927

Issued March 3, 1931

332. In a frequency modulation receiver with a discriminator or converting network as described in the Usselman patent and illustrated in Figure 2 thereof, there would be serious distortion.

333. The Usselman patent did not refer to the problem of distortion in a frequency modulation receiver and did not state any solution for that problem.

334. The Usselman patent did not disclose any type of predistortion and restoration.

335. The Usselman patent did not disclose that there might be frequencies beyond the range of swing which will cause distortion unless the discriminator were sufficiently wide to act on such frequencies without loss of linearity and with uniformity in change of phase.

#### CROSBY PATENT 2,071,113

Filed Oct. 17, 1935

Issued Feb. 16, 1937

336. The Crosby patent did not refer to the problem of distortion in a frequency modulation receiver.

337. The Crosby patent did not suggest the use of any kind of predistortion and restoration in a frequency modulation system.

338. The converting network illustrated in Fig. 2 of the Crosby patent and described therein would have to be modified by increasing the spacing between the resonance points as shown therein if distortion were to be avoided.

#### BOWN PATENT 2,212,338

Filed April 28, 1938

Issued Aug. 20, 1940

339. The Bown patent expressly suggested a type of predistortion in which the higher frequencies were to be accentuated as compared with the lower frequencies at a rate higher than the increase of absolute frequency.

340. Predistortion as specifically suggested in the Bown patent would cause a prodigious amount of distortion at the receiver.

341. Bown did not make any experiments or tests of the proposal for predistortion disclosed in the Bown patent.

342. The Bown patent did not refer to the problem of distortion at the receiver or suggest any solution for such distortion.

343. The accentuation or predistortion of the higher frequencies expressly taught in the Bown patent is much

greater than the particular predistortion specifically described in the Reissue patent.

#### AFFEL PATENT 1,819,054

##### Filed May 24, 1927
##### Issued Aug. 18, 1931

344. The Affel patent was an early disclosure of a proposal that predistortion and restoration might be employed in radio communication. The patent did not expressly refer to frequency modulation.

345. The form of predistortion and restoration specifically described in the Affel patent is not suitable for radio communication. There is no evidence that the form of predistortion and restoration described in the Affel patent has ever been used in radio communication.

#### INAUGURAL ADDRESS OF ALAN HAZELTINE

##### February 1936

346. Professor Hazeltine in his inaugural address as President of the Institute of Radio Engineers praised the then latest work of Major Armstrong on frequency modulation and accepted his teachings as valid.

347. Professor Hazeltine raised the speculation whether predistortion and restoration might be usefully employed in the frequency modulation system with which Major Armstrong was working.

348. Professor Hazeltine suggested that to provide such predistortion the condenser-resistance inverting network might be taken out of Armstrong's phase-shift transmitter (disclosed in 068 and 069 patents) and placed in the receiver.

349. Predistortion as suggested by Professor Hazeltine in the preceding Finding 348 herein would result in an accentuation of the higher frequencies as compared with the lower frequencies in the signal at a rate equal to the increase in absolute frequency.

350. Such predistortion would be much greater than the predistortion specifically disclosed in the Reissue patent.

351. Professor Hazeltine did not refer to the possibility of distortion at the receiver.

352. The particular predistortion suggested by Professor Hazeltine is different from the particular predistortion expressly disclosed in the Reissue patent.

#### SUMMARY

353. None of the foregoing prior art references disclosed the particular characteristic for predistortion and restoration which was disclosed in the Reissue patent.

354. None of the prior art references disclosed a discriminator with an admittance band or operating range substantially wider than the peak-to-peak swing.

355. None of the prior art references disclosed the problem of distortion at the receiver when predistortion and restoration was employed.

356. None of the prior art references disclosed the system of preemphasis and deemphasis described in Findings 292 to 294 herein.

357. In 1939, Messrs. Fyler and Worcester were employed by the General Electric Company.

358. Preemphasis was then in experimental use at the Alpine Station.

359. In 1938, the General Electric Company had delivered certain receivers to Major Armstrong which had been custom-built by the General Electric Company on the order of Major Armstrong. Those receivers were designed for reception of frequency modulation signals from the Alpine Station and the stations of the Yankee Network. Those receivers included deemphasis circuits to compensate for the preemphasis then being employed by Major Armstrong in his experimental transmissions.

360. The information in the Fyler and Worcester article concerning a restorer network in the receiver, and the proper bandwidth for the receiver circuits was derived by the General Electric Company from Major Armstrong.

361. There is no evidence that Messrs. Fyler and Worcester published

anything in the article of July 1939 concerning the use or characteristics of a restorer network and the proper bandwidths for circuits in the receiver, including the discriminator, except such information as had been derived by the General Electric Company from Major Armstrong.

## Was there Infringement?
### TELEVISION RECEIVERS

362. Each of the receivers designated as Model No. 614 and as Model No. 571 contains a deemphasis network which passes signals of low audio frequencies to a greater degree than signals of high audio frequencies by attenuating high frequency signals to a greater degree than low frequency signals. That network produces an effect on the audio frequencies at the receiver in accordance with the characteristic of a resistance-capacitance network having a time constant of about 75 microseconds. The effect of that network is to compensate for the preemphasis provided for in the Rules of the Federal Communications Commission.

363. Each of the receivers designated as Model No. 614 and as Model No. 571 contains a discriminator which has an output amplitude versus input frequency characteristic which has a peak-to-peak bandwidth from about 125 to 385 kilocycles and a linear portion from about 90 to 200 kilocycles. The admittance band of such discriminator is substantially greater than the extent of swing of the received frequency modulated wave.

364. In the normal and expected use of the foregoing receivers in receiving television sound programs, the user would not make any change or adjustment in the deemphasis network or in the admittance band of the discriminator.

### FM BROADCAST RECEIVERS

365. Each of the broadcast receivers designated as Model No. 557 and as Model No. 586 contains a deemphasis network which passes signals of lower audio frequencies to a greater degree than signals of high audio frequencies by attenuating

high frequency signals to a greater degree than low frequency signals. That network produces an effect on the audio frequencies at the receiver in accordance with the characteristic of a resistance-capacitance network having a time constant of about 75 microseconds. The effect of that network is to compensate for the preemphasis provided for in the Rules of the Federal Communications Commission.

366. Each of the broadcast receivers designated as Model No. 557 and as Model No. 586 contains a discriminator which has an output amplitude vs. input frequency characteristic which has a peak-to-peak bandwidth with an approximate value of 350 kilocycles and is linear over a central bandwidth with an approximate value of 200 kilocycles. The admittance band of such discriminator is substantially greater than the extent of swing of the frequency modulated wave.

367. In the normal and expected use of the foregoing receivers in receiving FM sound programs, the user would not make any change or adjustment in the deemphasis network or in the admittance band of the discriminator.

## Has there been Misuse?
368. The first license granted by Major Armstrong under his frequency modulation patents was to General Electric Company and was dated as of October 15, 1938.

369. By the end of 1941, the following companies had taken licenses from Major Armstrong under his frequency modulation patents for the manufacture and sale of FM broadcast receivers and television receivers:

Ansley Radio Corporation
Espey Manufacturing Company, Inc.
Philharmonic Radio Company
Freed Radio Corporation
General Electric Company
The Hallicrafters Company
Howard Radio Company
Magnavox Company, Incorporated

Meissner Manufacturing Division, (Maguire Industries, Incorporated)

Pilot Radio Corporation

E. H. Scott Radio Laboratories, Inc.

Stewart-Warner Corporation

Stromberg Carlson Telephone Manufacturing Company

Zenith Radio Corporation

370. The licenses to the foregoing companies provided for payment of a royalty of 3% of the adjusted selling price of receivers which were manufactured under the licenses. The term "adjusted selling price" was defined in the licenses as the manufacturer's gross selling price of a complete receiver less various deductions and after certain adjustments.

371. During World War II, Major Armstrong waived all royalties under his frequency modulation patents in connection with FM apparatus which was manufactured for use by the Armed Forces of the United States.

372. In 1945 and after the resumption of the commercial manufacture of radio receiving sets which had been halted during World War II, Major Armstrong's FM receiving set licenses were modified to reduce royalty rates from 3% to 2½% of the adjusted selling price for licensed receivers. Other changes made in the license agreement were as follows:

(a) the provisions giving Major Armstrong a right to a license under any patents owned by the licensee were deleted;

(b) the scope of the license was extended to cover the manufacture and sale of FM chassis which were not complete receiving sets;

(c) certain revisions in the deductions allowable in determining the adjusted selling price were made;

(d) the provision restricting the licensee to manufacture at a designated plant was removed; and

(e) the language of the license grant and royalty clauses was changed to provide expressly that royalties were payable only in respect of apparatus em-bodying inventions covered by the patents or designed, manufactured and tested by means of methods or systems covered by the patents.

373. With respect to the payment of royalties on FM broadcast receivers and television receivers, all of Major Armstrong's post-war licenses provided as follows:

"(a) 2½% of the Licensee's adjusted selling price of each frequency-modulation receiving set, 4% of the Licensee's adjusted selling price of each frequency-modulation receiving set chassis, and 4% of the Licensee's adjusted selling price of each frequency-modulation converter, embodying any or all of the inventions covered by the United States frequency-modulation patents of the Licensor or designed, manufactured, tested, checked, inspected or demonstrated by the use of any method or system of apparatus embodying any or all of the inventions covered by said patents, and sold by it in the United States or sold for export but not actually exported." (License BR-5, p. 4 and License BR-6, p. 4.)

374. In computing the "adjusted selling price" for television receivers, the licensee was entitled to deduct 50% of the manufacturer's gross selling price for the complete receiver in the case of television receivers which were capable of receiving wide band FM signals on the television sound channel and on FM broadcasting channels and was entitled to deduct 75% of the manufacturer's gross selling price in the case of television receivers which were capable of receiving FM signals only on the television sound channel.

375. After World War II, the following companies had licenses under the frequency modulation patents owned by Major Armstrong and paid royalties to him in connection with their manufacture and sale of FM broadcast receivers and television receivers:

Airadio, Incorporated

Ansley Radio Corporation

Browning Laboratories, Inc.
Collins Audio Products Company, Inc.
Espey Manufacturing Company, Inc.
Fisher Radio Corporation
Freed Radio Corporation
General Electric Company
The Hallicrafters Company
Howard Radio Company
Meissner Manufacturing Division, (Maguire Industries, Incorporated)
Minerva Corporation of America
North American Philips Company, Inc.
Pilot Radio Corporation
Radio Engineering Laboratories, Inc.
Scott Radio Laboratories, Inc.
Stewart-Warner Corporation
Stromberg Carlson Company
Templetone Radio Manufacturing Corporation
Westinghouse Electric Corporation
Wilcox-Gay Corporation
Zenith Radio Corporation

376. After World War II, Major Armstrong also granted licenses to the operators of more than 300 FM broadcast stations. Each of the licenses provided that the broadcaster would have the right to make or have made and to operate an FM broadcast transmitter for the transmission of programs to the general public and required the broadcaster to pay a lump sum royalty based upon the operating power of the transmitter as initially installed and to pay an additional royalty in the event that the broadcaster should later increase the operating power of the transmitter. The schedule of royalties provided for in each license ranged from $150 for an operating power of 250 watts to $2,500 for an operating power of 50 kilowatts. Each of the licenses expressly provided that no license for reception was granted except for purposes of monitoring the operation of the FM broadcast transmitter.

377. Major Armstrong granted licenses under his frequency modulation patents to manufacturers of apparatus for police radio communication and for other mobile and miscellaneous purposes. After World War II the following companies had such licenses:

Gover Dual Signal Systems, Inc.
Doolittle Radio, Inc.
Finch Telecommunications, Inc.
Freed Radio Corporation
General Electric Company
The Hallicrafters Company
Howard Radio Company
Fred M. Link (an individual)
Radio Engineering Laboratories, Inc.
Western Electric Company, Inc.
Westinghouse Electric Corporation
The Western Union Telegraph Company

378. Major Armstrong granted a license under his frequency modulation patents to The Western Union Telegraph Company for public service communication, namely, in radio communication service in which tolls are charged to the public for messages transmitted by the operator of the service.

379. In the period from 1938 to 1953, Major Armstrong received royalties from his licenses in the aggregate amount of about $4,475,000 of which about $3,713,000 were paid in connection with the manufacture and sale of FM broadcast receivers and television receivers and about $168,000 were paid by the operators of FM broadcast transmitters.

380. There is no evidence that Major Armstrong was at any time engaged in the commercial manufacture and sale of radio apparatus.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and over the subject matter. 28 U.S.C. §§ 1331, 1338.

2. This Court accepts and follows the opinion of Judge Dawson, Armstrong v. Emerson Radio & Phonograph Corp., D.C.S.D.N.Y.1955, 132 F.Supp.

176, overruling defendant's objections to substitution of the present plaintiff on the ground that the action for patent infringement survived the death of Armstrong, the original plaintiff in this action. The executrix was properly substituted.

■ 3. The plaintiff gave defendant legally effective notice of infringement on December 20, 1948. This is the earliest date for which plaintiff can claim recovery in this action.

■ 4. The 069 patent, the 066 patent and the Reissue patent comply with the statute in that each contains such a full, clear, concise and exact description of the inventions thereof that persons skilled in the art to which they pertain could use and practice, or make and use, said inventions. Rev.Stat. § 4888 (1875), 35 U.S.C. § 112 (1958); Minerals Separation, Ltd. v. Hyde, 1916, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; A. B. Dick Co. v. Barnett, 2 Cir., 1923, 288 F. 799; Eibel Process Co. v. Minnesota & Ontario Paper Co., 1920, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

5. The claims of the 069 patent, the 066 patent and the Reissue patent comply with the statute in that they particularly point out and distinctly claim the inventions thereof. Rev.Stat. § 4888 (1875), 35 U.S.C. § 112 (1958); O'Reilly v. Morse, 1853, 15 How. 62, 56 U.S. 62, 14 L.Ed. 601; General Electric Co. v. Nitro-Tungsten Lamp Co., 2 Cir., 1920, 266 F. 994; Schick Dry Shaver v. R. H. Macy & Co., 2 Cir., 1940, 111 F.2d 1018, petition for rehearing denied, 112 F.2d 1007; Eibel Process Co. v. Minnesota & Ontario Paper Co., supra.

■■ 6. Emerson did not have any license under the patents in suit by virtue of its license under the 447 patent. Gould Storage Battery Co. v. Electric Storage Battery Co., 2 Cir., 1911, 192 F. 28, certiorari denied, 1912, 223 U.S. 730, 32 S.Ct. 527, 56 L.Ed. 634; Hall v. Keller, 5 Cir., 1950, 180 F.2d 753, certiorari denied, 340 U.S. 818, 71 S.Ct. 48, 95 L.Ed. 601. RCA, the licensor of Emerson,

could not grant to Emerson any greater right or interest than it possessed. H. Goodman & Sons, Inc. v. Rubin, D.C.S.D. N.Y.1933, 4 F.Supp. 241, 244, affirmed per curiam, 2 Cir., 1935, 76 F.2d 1012.

7. The Reissue patent was lawfully reissued. See Topliff v. Topliff, 1892, 145 U.S. 156, 165, 170–172, 12 S.Ct. 825, 36 L.Ed. 658; Keller v. Adams-Campbell Co., Inc., 1924, 264 U.S. 314, 317, 44 S.Ct. 356, 68 L.Ed. 705; Monogram Mfg. Co. v. Glemby Co., 2 Cir., 1943, 136 F.2d 961, 964, certiorari denied, 320 U.S. 778, 64 S.Ct. 93, 88 L.Ed. 467; Iowa Washing Mach. Co. v. Montgomery Ward & Co., D.C.S.D.N.Y.1915, 227 F. 1004, 1006–1007; Witzel v. Berman, 2 Cir., 1914, 212 F. 734, 735.

8. Armstrong's licenses and his licensing activities were lawful and did not constitute a misuse of his FM patents. Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312.

9. The 069 patent is valid and Emerson has infringed claims 1 and 2 thereof by the manufacture and sale of FM broadcast receivers and television sound receivers. Girdler Corporation v. E. I. DuPont DeNemours & Co., D.C.D.Del. 1944, 56 F.Supp. 871, affirmed per curiam, 3 Cir., 1946, 152 F.2d 757; Detroit Lubricator Co. v. Toussaint, D.C.N.D.Ill. 1944, 57 F.Supp. 837; Metallizing Engineering Co. v. Metallizing Co., D.C.S.D. N.Y.1945, 62 F.Supp. 274, 276–277; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1958, 168 F.2d 778; Harris v. National Machine Works, Inc., 10 Cir., 1948, 171 F.2d 85; 35 U.S.C. § 271(d)(3) (1958). Contra, Master Metal Strip Service, Inc. v. Protex Weatherstrip Manufacturing Co., 7 Cir., 1948, 169 F.2d 700; Jacquard Knitting Machine Co. v. Ordnance Gauge Co., 3 Cir., 1954, 213 F.2d 503; Stroco Products, Inc. v. Mullenbach, 67 U.S.P.Q. 168 (S.D.Cal.1944).

10. The 066 Patent is valid and Emerson has infringed claims 8, 9 and 10 thereof by the manufacture and sale of FM broadcast receivers and television sound receivers.

11. The Reissue patent is valid and Emerson has infringed claims 1, 2, 4 and 6 thereof by the manufacture and sale of FM broadcast receivers and television sound receivers.

12. Since the Reissue patent, the latest issued of the patents in suit, expired on September 17, 1957, while this action was pending, injunctive relief may not now be granted.

13. Plaintiff is entitled to an accounting of the actual damages sustained by plaintiff and plaintiff's predecessor, Edwin Howard Armstrong, as a result of the infringing manufacture and sale by Emerson of FM broadcast receivers and television receivers during the period beginning on December 20, 1948, the date on which plaintiff gave defendant legally effective notice of infringement, and ending on September 20, 1957, when the Reissue patent expired.

14. There is insufficient proof in the record thus far to sustain the plaintiff's claim for treble damages. Such damages are awarded only in exceptional cases involving fraud or conduct tantamount to fraud. Laskowitz v. Marie Designer, Inc., D.C.S.D.Cal.1954, 119 F.Supp. 541; Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp., D.C.S.D.Fla.1958, 159 F.Supp. 769. The plaintiff may, however, submit any relevant proof to the Master to be appointed.

15. Plaintiff is not entitled to an award of costs and attorneys' fees unless the proof before the Master justifies the award of such fees. 35 U.S.C. §§ 284, 285 (1958).

Submit judgment on notice providing for reference to a Master on issues of damages, pursuant to Rule 53 of the Rules of Civil Procedure, 28 U.S.C.