**UPJOHN COMPANY, Plaintiff,**

v.

**ITALIAN DRUGS IMPORTING CO., Inc., Delmond Pharmaceutical Corporation and Ignazio Piracci, Defendants.**

United States District Court
S. D. New York.

Jan. 9, 1961.

Kenyon & Kenyon, New York City (Ralph L. Chappell, Francis T. Carr, New York City, of counsel); Joseph K. Andonian, Esq., Kalamazoo, Mich., for plaintiff.

John P. Chandler, New York City, for defendants.

MacMAHON, District Judge.

This is an action for patent infringement tried by the Court without a jury. The patent involved was issued to John T. Correll on March 29, 1949 for a surgical sponge made of gelatin foam hardened to water insolubility and absorbable by a living body in from ten to ninety days.

Plaintiff, The Upjohn Company, a Michigan corporation, is assignee of the patent and manufactures and sells the surgical sponge under the trademark "Gelfoam". Defendant companies, New York corporations, import the accused product from Italy where it is manufactured and market it in this country under the trademark "Spun-Gel". Defendant Piracci, a New York resident, is the president of the defendant corporations as well as a major stockholder. This Court has jurisdiction of the parties and of the subject matter. 28 U.S.C.A. § 1338(a) and § 1400(b).

Plaintiff abandoned a claim for unfair competition at pretrial conference, and the parties stipulated that only Claim 6 of the patent is at issue. Defendants challenge validity and deny infringement. They assert that Claim 6 is bad in form because it describes a function at the exact point of invention. The ultimate issues raised, therefore, are (1) whether the patent is valid, and, if so, (2) whether defendants' product infringes.

### Validity

■ It is necessary to reconstruct the factual situation as it existed at the time Correll made his application in order to determine whether there has been invention over the prior art. Van Heusen Products v. Earl & Wilson, D.C.S.D.N.Y. 1924, 300 F. 922.

Correll, a research chemist, had been working on the problem of blood coagulants from about 1940. He found that a liquid coagulant such as thrombin was unsuitable for surgery because it usually formed a clot away from the point of hemorrhage. This research revealed a need for some product such as a sponge which would form a matrix around which a clot could form. Gauze sponges had been used for this purpose of centuries, but it was necessary to remove them before suturing, and this often disturbed the clot causing renewed hemorrhaging. Furthermore, there was always a danger that through inadvertence a gauze sponge would be left in the body where it might cause infection and certainly invite a suit for malpractice.

Confronted with these problems in March of 1944, Correll conceived that their solution lay in a water insoluble sponge absorbable in a living body. Not only could such a sponge be left in the surgical cavity to form a matrix for a clot at the point of flow, it could also be saturated with a coagulant or antibiotics as well as serve as packing to prevent lesions. Even more significantly, it could be left in the body. In approximately five months, Correll developed a sponge made of gelatin, whipped into a foam and hardened to water insolubility either by formaldehyde or some other process, yet absorbable by a living body. The patent at issue covers this product.

■ It should be noted at the outset that the patent is presumed valid, and the burden of establishing invalidity rests on the defendants. 35 U.S.C.A. § 282. Their burden is a heavy one and every reasonable doubt should be resolved against the party asserting invalidity. Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983.

■ Contending that Correll's sponge was obvious to one skilled in the prior art, defendants cite fourteen patents and other publications which they claim anticipated the Correll sponge. At the threshold of our quest for invention we must look to the history of the art. Invention is the act of selection, but "it must be beyond the capacity of the common-place imagination. Often we can truly treat the inquiry as one of fact by observing what went before and what followed. If the combination would have had practical value long before it appeared, if no impediment, technical, or commercial, stood in the way, if during that time others had been at work upon the same subject, and if the invention was at once accepted as an answer to the old need, there is usually just basis for the inference" of invention. B. G. Corporation v. Walter Kidde & Co., 2 Cir., 1935, 79 F.2d 20, 22.

■■ Applying these criteria here, it is plain that what went before fell far short of Correll's sponge. All of the previous patents reveal a "tragic flaw" which would lead not to Correll's sponge but away from it. Indeed, the fact that defendants are forced to rely on so many prior art patents and publications in support of their contention that Correll's invention lacks novelty is in itself significant evidence of the weakness of their defense. Reynolds v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, 83, certiorari denied 1948, 334 U.S. 844, 68 S.Ct. 1513,

92 L.Ed. 1768; York Ice Machinery Corp. v. L & K Ice Corp., D.C.S.D.N.Y.1934, 6 F.Supp. 544. Moreover, the fact that this and similar prior art was before the Patent Office during the prosecution of the patent reinforces the presumption of validity. Stevens v. Carl Schmid, Inc., 2 Cir., 73 F.2d 54, certiorari denied 1934, 294 U.S. 721, 55 S.Ct. 548, 79 L.Ed. 1253.

The keystone to Correll's invention lies in his achievement of a sponge insoluble in water yet absorbable in a living body in from ten to ninety days. Six of the cited patents[1] lack the necessary insolubility. Some indeed were invented with the object of making gelatin *more* soluble.. None of them, therefore, would lead to the desired result because a surgical sponge must have a degree of insolubility to prevent immediate disintegration upon contact with blood or other body fluid.

Seven of the cited patents[2] contain ingredients or combinations of ingredients which would not be absorbable by a living body. These patents cover such diversified products as cushion stuffing, wall board, and imitation beer, all quite remote from surgical sponges. Certainly none could be inserted or remain in the body for any length of time without deleterious effect since none were absorbable.

Of the remaining cited patents, Sharp's[3] was for sutures made of animal ligaments and Altschell's[4] was for a stomach astringent. Obviously, neither had anything to do with foamed gelatin or surgical sponges.

The three publications cited[5] all speak of water soluble gelatin made insoluble by the use of formaldehyde. Such teaching resulted in a product known as formo-gelatin, a powder used as an antiseptic for surface wounds, but gave no clue to a gelatin which is insoluble yet absorbable by living tissue. Nor is there any suggestion that gelatin could be used as a surgical sponge. Looking at the problem, therefore, from the view of what had gone before in the chemistry of gelatin and glue, it is plain that the gelatin sponge was not obvious to one skilled in the prior art. Indeed, the chief defense witness, Dr. Donald K. Tressler, an acknowledged expert in the field of gelatin and glue, admitted that the prior art would not, in fact, lead to the foam gelatin sponge.

Tressler, after examining the sum total of the prior art, would not state that the invention was obvious but only that it might be deduced with an adequate library at one's disposal. He felt that perhaps two prior experts in the gelatin field, Doctors Bogue or Alexander, could or should have solved the problem. This hypothetical opinion smacks of the wisdom of hindsight and does not square with the historical facts.

Correll was looking for a surgical sponge from the standpoint of the medical profession. It is, therefore, necessary to consider also the prior art in surgical sponges. Defendants' witnesses testified that some sort of loosely-woven cloth, usually gauze, had been used as a surgical sponge for centuries. Viewed from the existing surgical art, Correll's product was certainly not obvious. On the contrary, it was a marked departure from the prior art since it effectively combined the use of coagulants with sponges without the peril of leaving dangerous foreign substances in the body.

1. Brooks, U.S.Pat. No. 243,685; Atherton, U.S.Pat. No. 1,892,599; Abernathy, U.S.Pat. No. 1,574,228; Sheppard, U.S. Pat. No. 2,000,042; Schalz, U.S.Pat. No. 2,019,363; and Reichal, U.S.Pat. No. 2,-166,074.

2. Brat, U.S.Pat. No. 659,204; Caldwell, U.S.Pat. No. 948,845; Holcomb, U.S.Pat. No. 1,485,994; Brown, U.S.Pat. No. 2,-036,913; Mould, U.S.Pat. No. 2,141,-750; and two by Bayer, German Pat. No. 675,775 and British Pat. No. 265,-986.

3. U.S.Pat. No. 1,999,641.

4. U.S.Pat. No. 658,747.

5. Arbinger (Glue and Gelatin, New York, 1923); Bogue (Chemistry and Technology of Gelatin and Glue, New York, 1922); and Bennett (Animal Proteins, New York, 1921).

■ Almost immediately after Correll's sponge was introduced on the market, it met with success. Thus, it was at once accepted as the answer to the old need. Commercial acceptance is not decisive on the issue of invention, but it is a factor meriting weight. Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 258 F.2d 124, certiorari denied 1958, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 1957, 247 F.2d 343, certiorari denied 1958, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed. 2d 529. The evidence shows that since the product was first offered on the market, gross sales have amounted to over $7,000,000 with sales in 1959 approaching $800,000. It is almost self-evident that the product would have had both practical and commercial value if it had appeared earlier. In this connection plaintiff points to sixty-nine tort actions resulting from leaving gauze sponges in the body.

■ There were no impediments, either technical or commercial, standing in the way of a gelatin sponge insoluble in water yet absorbable in a living body. The only ingredients, gelatin and formaldehyde, had been known for years. It was Correll who took these and combined them in the correct quantities to achieve the desired result. Thus, the conclusion is impelled that until the flash of genius called invention struck Correll, no one hit upon the answer to an ancient need. Correll's invention lies not in the fact that he combined two well-known ingredients but in the fact that he did so in such a way as to produce a novel and useful product far surpassing the earlier use of its constituent elements. "A novel combination of old elements which co-operate with each other so as to produce a new and useful result is patentable." Technical Tape Corp. v. Minnesota Mining & Mfg. Co., supra [247 F.2d 347].

### Indefiniteness

The patent statute requires that the specification must describe the invention in "full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make and use the same * * *." and there must be claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C.A. § 112. As noted earlier, only Claim 6 is challenged by defendants. That claim is: "A water permeable surgical sponge having a matrix consisting essentially of gelatin sponge hardened to the point of water insolubility and characterized by substantially complete biological absorbability in a living animal body in between about ten and about ninety days."

Defendants focus their attack on the language "substantially complete absorbability in a living animal body in between about ten and about ninety days." This language, the defendants claim, is not sufficiently definite to comply with the statutory requirement in that the patentee has described his invention in terms not of what it is, but of what it does. This, defendants urge, is functional description at the exact point of novelty and, therefore, invalidates the patent under the doctrine of General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 371, 58 S.Ct. 899, 82 L.Ed. 1402. I do not agree.

The purposes behind the statutory requirement of definiteness are that: "Those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid invention, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case." Georgia-Pacific Corp. v. United States Plywood Corp., supra [258 F.2d 136].

■ Definiteness must always be gauged not by abstract rules but by the facts in each case. Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945, 948, certiorari denied 1938, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415.

The facts here are similar to those in Georgia-Pacific Corp. v. United States Plywood Corp., supra, where the claim was for plywood striated at certain intervals to equalize stresses on the entire surface of a plywood panel. The spaces between the grooves were described as "sufficiently closely spaced to localize within the individual ribs or groups of ribs the normal stresses arising from shrinking, expanding and the like." This was held sufficiently definite under the circumstances imposed by the nature of the product.

The same situation exists here. In discussing the aspects of the claim in dispute, the Court notes the difficulties encountered in describing the product. We have a situation where a sponge is allowed to remain in a living animal body. When this is done, it is absorbed in "from about ten to about ninety days". Thus, it must be described in terms of effect, i. e., what will happen to it rather than what it will do.

The challenged language, when read in the context of the whole claim, limits rather than broadens the scope of the invention, and leaves a large area free for subsequent invention. The patentee has reserved for himself a very small area. The product must be made of gelatin; any other substance would not infringe. It must have all the qualities of a sponge and be insoluble in water and absorbable in a living body in the specified period of time. Products that do not fall within these exact limits, such as sponges made of blood or starch, are not claimed as infringing.

When taken together, the terms of the claim form an enclosing fence of specifications that do not broaden but rather narrow the product protected by the patent. There is little alternative to the patentee's choice of language. Thus, "a limited use of terms of effect or result, which accurately define the essential qualities of a product to one skilled in the art, may in some instances be permissible and even desirable * * *." General Electric Co. v. Wabash Appliance Corp., supra, 304 U.S. at page 371, 58 S.Ct. at page 903. In this case, considering the legislative purpose to protect invention, the description of the properties of the product in terms of its effect is the best possible under the circumstances and therefore desirable. "It is impossible to suppose that anyone who really wished to respect the patent would have any difficulty in identifying what the claim covered." Musher Foundation, Inc. v. Alba Trading Co., 2 Cir., 150 F.2d 885, 889, certiorari denied 1945, 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465. Thus, there is no merit to defendants' contention that the challenged claim is indefinite.

## Infringement

Defendants admit and represent in their advertising that their sponges are sterile, water insoluble gelatin sponges which will be absorbed by the body in from three to six weeks. Defendants' witness testified that the accused sponge was hardened to the point of insolubility and that it was sterilized by dry heat. There is no difference in the end results of the two products, whether hardened through the use of formaldehyde and heat or heat alone. Both products have been hardened to the point of water insolubility. There is no substantial difference in the product resulting from variances in hardening processes.

■ Defendants also claim that the three to six week period required for bodily absorption of the accused product is a sufficient variance from the ten to ninety day period specified in the patent to constitute a new product. This minor deviation in degree, however, does not change the fact that the accused product performs the same function and attains the same end result as plaintiff's invention and, therefore, infringes at least under the doctrine of equivalents. Ma-

chine Company v. Murphy, 1877, 97 U.S. 120, 24 L.Ed. 935; United States Rubber Co. v. General Tire & Rubber Co., 6 Cir., 1942, 128 F.2d 104, 109. All of the requirements of the patent are seen in the accused product and have been either admitted or advertised by the defendants. I find that the accused product infringes the Correll patent.

■ Defendants also challenge the validity of Claim 6 on the ground that it contains matter not included in the original claim which was not presented until more than a year after the first public use of the invention. Specifically, they contend that the word "matrix" added to the final claim changes the scope of the invention. However, the concept of "matrix" is intrinsic to any spongelike substance. The addition of the word merely clarifies the language without broadening the invention. If the word were eliminated, the meaning of the claim would not be altered. Accordingly, this contention is also without merit. Engineering Dev. Labs. v. Radio Corp., 2 Cir., 1946, 153 F.2d 523.

■ Plaintiff also contends that the defendants' actions support a finding that the infringement was wilful. The consequences of such a finding might justify an award of punitive damages or attorney's fees to the plaintiff. 35 U.S.C.A. §§ 284, 285; Power Specialty Co. v. Connecticut Light & Power, 2 Cir., 1936, 80 F.2d 874, 878. Such awards are made sparingly and usually only where a clear showing of deliberate infringement justifies such use of the Court's discretion. Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp., D.C.S.D.Fla.1948, 159 F.Supp. 769, 777, affirmed 5 Cir., 1959, 270 F.2d 635. See Union Nat. Bank v. Superior Steel Corp., D.C.W.D.Pa.1949, 9 F.R.D. 117, 121.

■ The Courts have traditionally been reluctant to find an infringement wilful. There must be a deliberate purpose to infringe and such a purpose is not found where the validity of the patent and any possible infringement is open to honest doubt. Artmoore Co. v. Day-less Mfg. Co., 7 Cir., 1953, 208 F.2d 1, 5, certiorari denied 1954, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075; Rockwood v. General Fire Extinguisher Co., 2 Cir., 1930, 37 F.2d 62. See also Armstrong v. Emerson Radio & Phonograph Corp., D.C.S.D.N.Y.1959, 179 F.Supp. 95, 129.

The proof relied on by plaintiff shows only that Piracci had investigated the market potential for surgical sponges, encountered plaintiff's product, knew that it was patented, and to considerable degree copied plaintiff's product in size, shape and packaging.

The validity of plaintiff's patent had never been tested prior to this litigation. As we have seen, the invention is a combination of old elements into a novel product. Surely, however, the validity of the patent was not so certain as to preclude honest differences of opinion as to how the invention would stand up under the challenge of a trial. Unless defendants are to be judged by the wisdom of hindsight, the Court cannot say that they did not entertain honest doubts both as to the validity of the patent and its infringement by their product. Accordingly, the Court finds that defendants' infringement was not wilful.

Plaintiff also seeks to hold the individual defendant Piracci personally liable. Section 271(b) of Title 35 U.S.C.A., provides that whoever actively induces infringement of a patent shall be liable as an infringer.

■ Ordinarily, a corporate officer is not personally liable for an infringement when he acts merely as a corporate officer, although the infringement may have been committed under his general direction. Powder Power Tool Corp. v. Powder Actuated Tool Co., 7 Cir., 1956, 230 F.2d 409, 414; Claude Neon Lights, Inc., v. American Neon Light Corp., 2 Cir., 1930, 39 F.2d 548, 551. However, where a corporate officer exceeds his executive duties and deliberately organizes a corporation for the purpose of infringing a patent, or where he otherwise acts as the moving, active, conscious force behind an infringement, he may be held personally liable. Marks

v. Polaroid Corp., 1 Cir., 1956, 237 F.2d 428, 435, certiorari denied 1957, 352 U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 550; Claude Neon Lights, Inc. v. American Neon Light Corp., supra; Mojonnier Dawson Co. v. United States Dairies Sales Corp., D.C.N.D.Ill.1958, 168 F.Supp. 519, 530.

Piracci is the president and owns 86% of the stock of Italian Drugs, a family corporation, which for approximately forty years has been importing pharmaceutical products from Italy for sale primarily to Italian doctors within the United States. The company continuously adds new Italian products to its line.

In 1948, Piracci was shown an absorbable surgical sponge made in Italy by the Institute of the University of Milan, but did not become interested in it until a subsequent visit in 1951. As was his custom, he asked several doctors about the market potential for the product and had an investigation conducted as to the possibilities of any infringement. His lawyer informed him of the existence of the Correll patent, but distinguished the Italian product to Piracci's satisfaction. In view of the reputable source of the product and the facts mentioned earlier under the discussion of wilfulness, the Court cannot say that Piracci's reliance on his attorney was feigned.

In January, 1953, Piracci filed an application to register the trademark "Spun-Gel". Shortly thereafter, Delmond Pharmaceutical Corporation was organized by Piracci and three others who are otherwise unrelated to him. Piracci is the president and owns 25% of the stock of Delmond. Piracci assigned the "Spun-Gel" trademark to Delmond which commenced importing and selling the sponges to Italian Drugs and other pharmaceutical distributors.

According to Piracci, Delmond also sold other pharmaceuticals, but "Spun-Gel" was its principal product. He explained that Delmond was organized to reach a broader market than that enjoyed by Italian Drugs. Piracci freely admitted that, as president of Delmond, he made the decision to sell "Spun-Gel".

Plaintiff offered no evidence to show that Italian Drugs is unable to respond in damages, but points to the somewhat questionable financial status of Delmond as evidence that it was formed solely for the purpose of selling the infringing product.

While Delmond was admittedly formed primarily to sell "Spun-Gel", there is no showing that Piracci operated other than in his capacity as a corporate officer, or that he knew "Spun-Gel" infringed the Correll patent. Indeed, the participating activities of his established corporation, Italian Drugs, negate the possibility that Piracci organized Delmond solely as a vehicle to sell what was known to be an infringing product. Accordingly, the Court finds that Piracci is not personally liable.

Therefore, plaintiff is entitled to a judgment declaring Claim 6 of its patent, No. 2,465,357, valid and infringed by the defendants and enjoining the defendants from any further infringement. Plaintiff is also entitled to an accounting of the actual damages it sustained as a result of defendants' infringement.

This opinion shall constitute the Court's findings of facts and conclusions of law. Either party may, however, within ten days from the date hereof, propose additional or seriatim findings and conclusions.

Submit judgment on notice within ten days providing for reference to a Master on issues of damages, pursuant to Rule 53 of the Rules of Civil Procedure, 28 U.S.C.A.