MERCANTILE NATIONAL BANK OF
CHICAGO, Harold I. Snyder, Snyder
Manufacturing Company, Inc., Zimmer
Manufacturing Company, Plaintiffs,

v.

QUEST, INC., and Paul E. Magers,
Defendants.

Civ. No. 3571.

United States District Court
N. D. Indiana,
South Bend Division.

Feb. 5, 1969.

Robert L. Rasor, Graham, Rasor, Harris, Warsaw, Ind., Richard R. Trexler, Olson, Trexler, Wolters & Bushnell, Chicago, Ill., Francis J. McConnell, Chicago, Ill., co-counsel, for plaintiffs.

Robert G. Irish, Hood, Gust & Irish, Fort Wayne, Ind., for defendants.

## MEMORANDUM

GRANT, District Judge.

Plaintiffs, as patentees and licensees, under United States Letters Patent No. 3,115,138, bring this action for injunction and damages for infringement * against the manufacturing defendant, Quest, Inc., (Quest) and Paul E. Magers (Magers), its President and Chief Executive Officer. Plaintiffs charged that defendants' infringement was willful and deliberate and seek treble damages.

By their answer, defendants denied the charge of infringement, alleged invalidity of plaintiffs' patent, and denied enforceability by reason of alleged misuse. Defendants also counterclaimed on these same grounds and filed a second counterclaim charging plaintiffs with violation of the Indiana and Federal Anti-Trust Laws.

* Before trial, the Court granted defendants' Motion for Summary Judgment directed against a second count of complaint based

The patent in suit issued December 24, 1963, is titled "Evacuator." Its introductory line states: "This invention relates to evacuators and more particularly to surgical evacuators for the removal of fluid from the human body and the like."

Both the plaintiffs' device (Hemovac) and the alleged infringing device (Bel-O-Pak) are a self-contained, independently operable, evacuator for the extraction of body fluids, for ambulatory human use.

The questions of the issuance of the patent, its ownership, the jurisdiction of this Court, and the allegation that the defendants have manufactured and sold the alleged infringing device (Plaintiffs' Ex. 5–A–5–B and Plaintiffs' Ex. 6–A–6–E) are all admitted by the defendants and are not at issue here.

Following a lengthy trial to the Court, the issues have been thoroughly and exhaustively briefed by counsel and the matter is now ripe for decision.

After a careful study of all of the issues involved, the Court finds said Patent No. 3,115,138 to be valid, and infringed by the defendants and, also, finds against defendants on their counterclaim charging plaintiffs with misuse, and with a violation of the State and Federal Anti-Trust Laws.

## BACKGROUND

The evacuation of fluids from a closed wound following surgery had long been met by (1) gravity drainage, by (2) pressure dressings or compression bandages, or, in later years, by (3) negative pressure or suction. Both the gravity drainage and compression bandage methods carried with them considerable obvious inherent disadvantages.

Prior to the appearance on the scene of the patent in suit, continuous closed wound suction had been accomplished by (1) an electric or other power-driven vacuum pump; (2) a central suction

upon an alleged appropriation of trade secrets and confidential information.

system; and (3) the evacuated bottle. Each of these systems had many admitted disadvantages such as cost, noise, breakage and undependability, but, chiefly, except in the case of an evacuated bottle which the patient could conceivably carry around with him, they restricted the activity of the patient and delayed post-operative exercises, ambulation and rehabilitation.

Plaintiff's decedent, Dr. Robert T. McElvenny, became interested in continuous closed wound suction as early as 1959 and engaged with a Dr. Meuller of Switzerland in discussions on the subject. Dr. Meuller was at that time an orthopedic surgeon at Wesley Memorial Hospital in Chicago. Mr. Gregory Sullivan, another applicant for the patent in suit, was his assistant. The third applicant, plaintiff Harold I. Snyder, was the principal owner of plaintiff Snyder Manufacturing Company, Inc., a small manufacturing company in New Philadelphia, Ohio.

Plaintiff McElvenny and his medical associates took up this challenge to provide a better device for continuous closed wound suction that would be self-actuating and portable. After experimenting with, and abandoning, the use of plastic bottles, they turned to devices using a spring to assure continuous suction.

In January, 1960, one of plaintiff McElvenny's manufacturing interests demonstrated an illustrative prototype of plaintiffs' new evacuator at an orthopedic show in Chicago, sponsored by the American Academy of Orthopedic Surgeons. At that Chicago show, Mr. Allan Ramsay, plaintiff Zimmer's Chicago distributor, and a long-time friend of Dr. McElvenny, introduced the personnel of plaintiff Zimmer, including defendant Paul E. Magers, to the subject matter of the patent in suit. Magers, a graduate engineer, whose principal experience had been in the automotive field, had become general manager at Zimmer a year earlier. He left Zimmer the following June, 1960, to join a Zimmer competitor, DePuy Manufacturing Company (DePuy) also headquartered in Warsaw, Indian, as DePuy's manager.

Plaintiffs' application for Letters Patent was filed July 14, 1960. The plaintiff, Snyder Manufacturing Company, was granted exclusive rights to make, use and sell under the patent, and Snyder thereafter transferred to plaintiff Zimmer the exclusive sales rights.

The first Hemovacs were delivered to Zimmer in July of 1960 and production in quantity was delivered in September or October of that same year.

The defendant, Paul Magers, had little to do with the evacuator between January of 1960 and the time he left Zimmer in May or June of 1960. Later in the year and after he became employed with DePuy, his interest in the evacuator became more apparent. He made several trips to Chicago, either alone or with Keaton Landis of DePuy, to see Dr. McElvenny and Gregory Sullivan and to visit Wesley Memorial Hospital. Magers, accompanied by a Harry Hoopes, also went to New Philadelphia, Ohio, to see Harold Snyder (plaintiff herein who had been granted exclusive rights to make plaintiffs' Hemovac).

The assigned reason for Magers' trips to Chicago and to New Philadelphia, Ohio, was to attempt to work out some type of agreement with the plaintiffs regarding the distribution and/or manufacture of the evacuator. It is thus clear that at least by the fall of 1960, Magers had an interest in the subject matter and, further, that he recognized that the plaintiffs had some type of proprietary rights in the evacuator. Gregory Sullivan testified in his discovery deposition that during such a visit Magers said, "I am going to get one of those bags or bust." Harold Snyder testified that Magers and Hoopes told him that if they could not have a contract, "they would take the Hemovac and take it and use it anyhow * * *."

Inasmuch as the Hemovac came onto the market in the fall of 1960 and since Magers acquired at least one of the

devices some time around November of that year, there can be no doubt that Magers had knowledge of the "patent pending" with respect to the Hemovac as of that date.

The first concrete evidence we have of activity by Magers while at DePuy regarding the development of an evacuator was in September of 1961 when Magers received a reply letter to his inquiry searching for a manufacturing source of tubing for an evacuator. In October of 1961, Magers received another letter from a different manufacturer regarding the same subject, i. e., a source of tubing. Also during October, Magers was testing the suction characteristics of plaintiffs' Hemovac. A letter from Mr. Moffat of Industrial Plastics Corporation to Magers, dated December 13, 1961, regarding the tubing, suggests that Magers was sending Hemovac components to potential suppliers for possible duplication. This practice was admited by Magers during his testimony at the trial.

On January 24, 1962, Magers wrote to Amrette and Harry Hoopes regarding the progress of his development and perfection of an evacuator at DePuy and discussing the matter of the plaintiffs' pending patent rights.

Magers was discharged from his employment at DePuy on February 9, 1962, for reasons which relate in at least some degree to his activities in the development of an evacuator, or what was at that time referred to as the "Vaculator." In fact, DePuy filed suit a year later against Magers in the Kosciusko County Circuit Court alleging that Magers violated his duties and responsibilities as an employee of DePuy and that he was guilty of improper appropriation of DePuy property in reference to the evacuator which Magers started to develop while at DePuy. That suit was subsequently dropped.

Shortly after his departure from DePuy, Magers took his first steps with respect to his own marketing operations for an evacuator. It is clear that Magers had constructed a sample model of his Bel-O-Pak unit at least by April 27, 1962. He organized the defendant, Quest, Inc., about August of 1962 and the defendants were in commercial production of the accused Bel-O-Pak in about December of the same year.

Plaintiffs' patent issued December 24, 1963, and defendants were formally notified of infringement as to said patent shortly before April 2, 1964. Plaintiffs thereafter, on March 31, 1965, filed this action alleging infringement of their patent by these defendants.

## INFRINGEMENT ISSUE

The plaintiffs allege that claims 3 through 14 of their patent are infringed by the defendants' accused device. Counsel on both sides, for purposes of argument and discussion, have divided these claims into two categories and the Court will follow that pattern.

*Claims 4, 5 and 7 through 14:*

Inasmuch as Claims 5 and 7 through 14 are either dependent on, or are similar to Claim 4 of the patent in suit, all of the arguments, remarks and findings directed to Claim 4 (the independent claim) are also intended to encompass and to apply to Claims 5 and 7 through 14 for the purposes of this opinion.

■■ The Court finds from the evidence that these claims read directly and verbatim upon the defendants' Bel-O-Pak and that there is a real identity of means, operation, structure and result between the two devices here in question. (See Claim Charts PX 32–PX 35.) The United States Supreme Court stated the controlling principle in Graver Tank Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950), when it said:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

The Court is not persuaded by the defendants' arguments as they pertain

to defendants' interpretation of these individual claims, (standing alone as if in a vacuum), for the reason that the plaintiffs' invention is not the pump *per se,* or any part of the pump, but is, rather, a self-actuating, self-contained, surgical evacuator for ambulatory human use. Plaintiffs' invention relates to the combination of elements as defined in the claims of the patent and not to any one element or part of the invention in isolation.

On the basis of the evidence before the Court, we are of the opinion that the plaintiffs have sustained their burden of proof in showing that Claims 4, 5 and 7 through 14 are infringed by the defendants' accused structure, the Bel-O-Pak.

*Claims 3 and 6:*

■ There is no contention that these two claims read literally on the defendants' Bel-O-Pak. Plaintiffs base their charge of infringement with respect to these claims on what is commonly referred to as the "doctrine of equivalents." In the words of the Supreme Court in Graver Tank Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856 (1950):

> (I)f two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.

The Seventh Circuit Court of Appeals has accepted and applied the "doctrine of equivalents" in several cases. In Hunt v. Armour & Co., 185 F.2d 722, 728 (7th Cir., 1950), the Court said:

> It is well established that the test of infringement is whether the accused device does the same work in substantially the same way and accomplishes the same result. (Citations omitted.)

> An infringement is not avoided by a mere reversal or transposition of parts or a mere change in form without change in function. (Citations omitted.)

The central factual issue which permeated this entire case on the issue of infringement of Claims 3 and 6, and the application of the doctrine of equivalents, is whether the defendants' Bel-O-Pak is equivalent to a spring as recited in the patent in suit. Upon due and careful consideration of the evidence we are of the opinion that the accused device is equivalent to a spring and that the Bel-O-Pak infringes these two claims by reason of the application of the doctrine of equivalents as set forth by the Supreme Court and as accepted and applied by the Seventh Circuit Court of Appeals. The function and purpose of the two devices in issue are identical, and they are equivalent in that they do the same work in substantially the same way and accomplish substantially the same result.

*Willful and Wanton:*

■ The plaintiffs have alleged not only that the defendants are guilty of infringement of their patent, but also that such infringement was willful and wanton and thus that treble damages should be awarded pursuant to 35 U.S.C. § 284. On the basis of the evidence in this case, and especially in light of the fact that the defendants sought the advice of patent counsel before marketing their device, we find that the plaintiffs have failed to sustain the burden of proof necessary to show that the defendants' conduct was willful and wanton to the extent required for the recovery of treble damages. See Anderson Co. v. Sears, Roebuck & Co., 265 F.2d 755, 763 (7th Cir., 1959); Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1 (7th Cir., 1953); Upjohn Co. v. Italian Drugs Importing Co., 190 F.Supp. 361 (D.C.N.Y., 1961); Armstrong v. Emerson Radio & Phonograph Corp., 179 F.Supp. 95 (D.C.N.Y., 1959).

## VALIDITY ISSUE

The defendants have alleged in their answer that there can be no infringement of the plaintiffs' patent because it is invalid and also that the rights

granted by the patent are unenforceable by reasons of alleged fraud on the patent office in the prosecution of the patent application.

■■■■ When considering an allegation that a patent is invalid, the initial controlling rule is that a patent issued by the United States Patent Office is presumed to be valid. 35 U.S.C. § 282. This presumption is strengthened when the prior art references relied upon by the defendant, or their equivalents, were considered by the Patent Office before granting the patent. Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 298 F.2d 765, 768 (7th Cir.), cert. den. 369 U.S. 886, 82 S.Ct. 1160, 8 L.Ed. 2d 287 (1962); American Needle and Novelty Co. v. Schuessler Knitting Mills, 258 F.Supp. 98 (D.C.Ill., 1966), modified on other grounds, 379 F.2d 376 (7th Cir., 1967). On the other hand, there is no presumption of validity as against prior art which was not before the Patent Office during the prosecution of the patent application. Skirow v. Roberts Colonial House, 361 F.2d 388, 390 (7th Cir., 1966).

■■■■ It is also a well settled principle that a party alleging invalidity of a patent or of certain claims found in a patent "has a heavy burden of establishing invalidity by clear and convincing evidence." Walt Disney Productions v. Fred A. Niles Communications Center, 369 F.2d 230, 234 (7th Cir., 1966). The defendants have raised numerous contentions and have made several arguments as to why the patent in suit is invalid.

■■■■ First of all, the defendants contend that the claims of the patent in suit are directed to an old combination and are thus invalid within the holding of Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938). The Court is not convinced by defendants' argument. In the recent case of National Dairy Products Corp. v. Borden Co., 394 F.2d 887, 890, n. 8 (7th Cir., 1968), Judge Swygert made a statement which

is applicable here and which disposes of defendants' argument:

The fact that the Podlesak method combined separate steps that were old and revealed in the prior art does not negate patentability. Copease Mfg. Co. v. American Photocopy Equip. Co., 298 F.2d 772 (7th Cir., 1961). In addition, that no one discovered the patented method until Podlesak, though the individual steps were available for so long, is evidence of nonobviousness. See United States v. Adams, 383 U.S. 39, 51, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

■■■■ The second and third contentions of the defendants raise the issues of anticipation and obviousness. After a careful consideration of the references relied on by the defendants as constituting the prior art, we believe that an improvement has been made by the patented device, and thus there is no anticipation under 35 U.S.C. § 102, as argued by the defendants. Furthermore, upon consideration of the differences between the subject matter patented and the prior art, we are of the opinion that such subject matter as a whole would not be obvious at the time of the invention to a person having ordinary skill in the art to which the subject matter pertains. Thus, the patent is not invalid under 35 U.S.C. § 103 for obviousness. It is not necessary that the results produced by the combination of elements found in the patent produce an unusual or surprising result. Walt Disney Productions v. Fred A. Niles Communications Center, 369 F.2d 230, 234 (7th Cir., 1966).

■■■■ The prior art references on which the defendants rely consist of medical literature (articles) (DX 55A–55U) and prior patents (DX 30A–30T and DX 56A, B, C). Upon an examination of the medical literature, it is apparent that the technique, method or procedure of what may be termed "closed wound suction" had been known to the medical profession for years. The plaintiffs themselves do not dispute this fact.

This fact, however, does not affect the validity of the patent in suit, for the invention covered by the patent does not claim the technique or method of closed wound suction; no method claims were submitted to the Patent Office. The patent we are concerned with contains apparatus, not method claims.

Nor do the prior patent references relied on by the defendants support their contention that the patent in suit is invalid by reason of anticipation and obviousness. These alleged prior art patents do not disclose the elements as claimed in the patented invention, and, furthermore, the prior art patents which were made known to the patent examiner are equivalent, as far as their materiality to this case is concerned, to the alleged prior art patents which were not specifically brought to the attention of the patent examiner.

■ Our finding of non-obviousness is further supported by the secondary considerations which may be utilized in deciding the issue of obviousness. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The plaintiffs' Hemovac has made a valuable contribution to medical science and to the benefit of mankind; it has met with commercial success; and it has proved its superiority in the market place with competitive devices.

■ The defendants also allege that the plaintiffs committed fraud on the Patent Office in the prosecution of the application for the patent in suit and, consequently, the patent is not now enforceable because of "unclean hands." Upon an examination of the file wrapper history of this patent and of the evidence presented at the trial on this issue, we find that the defendants have not met the requisite burden of proof necessary to prove fraud on the Patent Office. The type of activity and conduct which calls for the denial of the enforceability of a patent due to fraud on the Patent Office involves a knowing and willful misrepresentation of a material matter. Martin v. Ford Alexander Corp., 160 F.Supp. 670 (D.C.Cal., 1958). Good faith is a complete defense. Walker Process Equipment Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The patentees were under no duty to communicate to the Patent Office something which they were not claiming, i. e., the technique or method of closed wound suction itself. The actions of the patentees in prosecuting the patented invention in the Patent Office were not of the clear and outrageous nature as is generally found in fraud on the Patent Office cases. See e. g. Precision Instrument Mfg. Co. v. Automatic Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

■ There is no indication in the file wrapper history as a whole that the patent examiner was in any way deceived or mislead by statements made by the patentees. Donald F. Duncan, Inc. v. Royal Tops Mfg. Co., 381 F.2d 879 (7th Cir., 1967); Marks v. Polaroid Corp., 237 F.2d 428 (1st Cir., 1956). And finally, where prior art known to the patentees does not anticipate the subject matter of the invention, there is no obligation to call such prior art to the attention of the patent examiner. Wen Products, Inc. v. Portable Electric Tools, Inc., 367 F.2d 764 (7th Cir., 1966); Canaan Products, Inc. v. Edward Don & Co., 273 F.Supp. 492, 501 (D.C.Ill., 1966).

The defendants' further contentions that the patent fails to meet the standard of invention for combination patents, that the claims do not read on the disclosure of the patent in suit, that the claims are functional at point of novelty, that the claims omit an essential element and that the claims are invalid for want of a supplemental oath are without merit and fail to support the defendants' allegations of patent invalidity.

## ANTITRUST AND MISUSE ISSUES

The defendants allege in their counterclaim that the plaintiffs have violated Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2), Section 3 of the Clayton Act (15 U.S.C.A. § 14) and the comparable state laws found in Burns' Ind.Stat.Ann. Sections 23–116 and 23–117.

■ Whenever issues arise involving alleged violations of the antitrust laws, the initial and often the pivotal point of the case is the determination of what constitutes the relevant market. This case is no exception.

■ Monopoly power, as required by Section 2 of the Sherman Act, means the "power of controlling prices or unreasonably restricting competition," but before it is possible to determine if one has such monopoly power, it is first necessary to define the relevant market. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 389, 380–381, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). The defendants' position is that the relevant market is limited to portable surgical evacuators (i. e., Hemovac, Bel-O-Pak, and Redivacette) and that the plaintiffs' 90% share of this market constitutes a dominant position. The plaintiffs do not dispute that they possess 90% of the portable surgical evacuator market, but they do dispute the defendants' contention regarding the extent and constitution of the relevant market. The plaintiffs argue that the relevant market is much broader than the portable, surgical evacuator market and includes all of those products which are available to effect wound drainage.

On the basis of the evidence in this case and on the basis of the criteria announced in United States v. E. I. Du Pont De Nemours & Co., supra, we are of the opinion that the relevant market consists of those products which are available to effect wound drainage, and that the relevant market is not restricted to and limited only to portable surgical evacuators. The Court in the Du Pont case said:

> The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced— price, use, and qualities considered. (At p. 404, 76 S.Ct. at p. 1012.)

■ The purpose of the plaintiffs' Hemovac is to effect wound drainage. Other devices or products which were used before the Hemovac and which are still being used today to effect wound drainage include gravity drainage, electric pumps of the Gomco type, central suction systems, 2-bottle siphon apparatus, and others. All of these products fall within the test set out in the Du Pont case for determining relevant market, for they are "reasonably interchangeable by consumers for the same purpose". Since there is no evidence as to what the plaintiffs' position and power are in the relevant market as we define it, the allegations as to violation of Section 2 of the Sherman Act must fail, for there is no relevant evidence here from which the Court can appraise the exclusionary or monopoly power which the plaintiffs are alleged to possess.

As to the allegations regarding the violation of Section 3 of the Clayton Act, the Supreme Court in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 321, 328–329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) held that in order for a contract to violate Section 3 of the Clayton Act, competition foreclosed by it must constitute a substantial share of the relevant market. Since the standard utilized in determining the proper relevant market for a Section 3 Clayton Act violation is the same as a Section 2 Sherman Act violation, the defendants' allegations that the plaintiffs violated Section 3 of the Clayton Act also fail by reason of the Court's definition of

the relevant market and the lack of any relevant evidence regarding the plaintiffs' share of said market. United States v. Chas. Pfizer & Co., 246 F. Supp. 464 (D.C.N.Y., 1965).

■ The Court in Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. at p. 335, 81 S.Ct. 623 held that since the contract (which involved an exclusive-dealing arrangement) did not fall within the broader proscription of Section 3 of the Clayton Act, it was likewise not forbidden by Section 1 or Section 2 of the Sherman Act either. That same principle applies equally well to the case at bar.

■ Furthermore, the defendants have failed to show any damages to their business or property as a result of the alleged maximum price-fixing provisions found in the agreements between Snyder Manufacturing Co. and Zimmer Manufacturing Co., which the defendants allege violate Section 1 of the Sherman Act. (See R. 9–11, 6–18). Since this antitrust action on the counterclaim is being brought by an individual(s), rather than by the government, it is incumbent upon such person(s) to prove that he has been injured in his business or property by reason of the alleged antitrust violation. 15 U.S.C.A. § 15. It is a well established rule that a pecuniary loss is an essential element which must be established before an individual can recover on a private antitrust treble damage action. Martin v. Phillips Petroleum Co., 365 F.2d 629 (5th Cir. 1966), cert. den. 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966), rehear. den. 386 U.S. 930, 87 S.Ct. 851, 17 L.Ed.2d 804 (1966); Peller v. International Boxing Club, 227 F.2d 593 (7th Cir., 1955); Turner Glass Corp. v. Hartford-Empire Co., 173 F.2d 49 (7th Cir., 1949), cert. den. 338 U.S. 830, 70 S.Ct. 57, 94 L.Ed. 505 (1949), rehear. den. 338 U.S. 881, 70 S.Ct. 154, 94 L.Ed. 541 (1949).

For the foregoing reasons, the Court finds against the defendants on their counterclaim alleging violations of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and Burns' Ind. Stat. Sections 23–116 and 23–117. We further find that the defendants' allegations regarding the plaintiffs' alleged misuse of the patent are without merit and afford the defendants no defense to the allegations of their infringement of the plaintiffs' patent, and afford defendants no rights to recover on Count 1 of their counterclaim.

Counsel for the plaintiffs are hereby invited to submit proposed findings of fact and conclusions of law not inconsistent with this opinion.

